Joseph J. KENNEDY et al., Plaintiffs,

v.

F. David MATHEWS et al., Defendants.

Civ. A. No. 76–390.

United States District Court, District of Columbia.

May 17, 1976.

Roger A. Schwartz, Ronald F. Pollack, Food Research and Action Center, Inc., New York City, for plaintiffs.

Sylvester Ligsukis, Office of Gen. Counsel, U. S. Dept. of HEW, Washington, D. C., Michael J. Ryan, Asst. U. S. Atty., Civ. Div., Washington, D. C., for defendants.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

FLANNERY, District Judge.

This suit concerns the federally sponsored Nutrition Program for the Elderly. Plaintiffs allege that defendants are impounding funds which Congress intended to be available for the program during Fiscal Year 1976 and request preliminary and permanent injunctive relief. The parties came before the court on April 30, 1976 for a scheduled hearing on plaintiffs' motions for a preliminary injunction and class certification. Prior to the hearing, defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted, thereby placing the merits in full issue, and both parties agreed in open court that trial on the merits be advanced and consolidated with the hearing on plaintiffs' motions. Upon consideration of the motions, memoranda submitted in support thereof, oral argument thereon, and the entire record herein, the court makes the following findings of fact and conclusions of law.

*Findings of Fact*

The Nutrition Program for the Elderly, established under Title VII of the Older Americans Act, 42 U.S.C. §§ 3045, *et seq.,* makes funds available to the states for the purpose of providing elderly persons with hot meals in pleasant surroundings. Although the Older Americans Act was signed into law in March, 1972, the nutrition program contained in Title VII did not get under way until July, 1973, due to Presidential vetoes of fiscal year (FY) 1973 appropriation bills. Title VII had authorized appropriations of $100,000,000 in FY 1973 and $150,000,000 in FY 1974. In addition to the FY 1974 appropriation for the program, Congress passed a supplemental appropriation giving the program the full $100,000,000 Congress had hoped would be spent for FY 1973. Since FY 1973 had completely gone by before the program had gotten under way in July, 1973, the program became an "advanced funded" or "forward funded" program, which spent funds in the year following that for which they were appropriated. In 1974, Congress extended the program for three more years, and provided for appropriations of $150,000,000 in FY 1974, $200,000,000 in FY 1975, and $250,000,000 in FY 1976. *See* 42 U.S.C. § 3405g. In FY 1974, a sufficient amount of money was appropriated to allow the program, when supplemented by the "advance funds", to operate at the $150,000,000 level.

The instant case concerns the appropriation for FY 1976. Congress appropriated $125,000,000 in new funds for the program for that period, and in addition, provided, "The level of operations for nutrition services for the elderly program shall be $187,500,000 per annum." Labor-HEW Appropriations Act for Fiscal Year 1976, Public Law 94–206, 90 Stat. 3, 19 (1976). Congress also appropriated 25% of $187.5 million for the "Transition Quarter" following FY 1976 (July 1, 1976–September 30, 1976). *Id.* The appropriations bill was vetoed by President Ford in December, 1975, but the House overrode on January 27, 1976, and the Senate followed suit on January 28.

Defendants, who are responsible for administering the program, interpreted the FY 1976 appropriations act to mandate only the expenditure of funds at a monthly rate which, if continued over an entire year, would result in a total expenditure of $187.5 million. Since the appropriations act did not become law until January, 1976, and since defendants did not issue a Program Instruction implementing the funding increase until March 27, 1976,[1] the $187.5 million annualized rate of expenditure will be effective only for the final three months of the fiscal year, and the total amount expended during FY 1976 will be approximately $160 million.

Plaintiffs are elderly persons who qualify for the program, but are unable to participate because of inadequate funding. Plaintiffs purport to represent the class of "all impoverished individuals, 60 years of age or older, who are in need of, and who seek the benefits of the Nutrition Program for the Elderly [Title VII of the Older Americans Act, as set forth at 42 U.S.C. §§ 3405 et seq.], but who are fully or partially denied such participation and aid as a result of the defendants' unlawful impoundment of between $26.5–$37.5 million in appropriated program funds." Memorandum in Support of Class Action Motion 1.[2] Plaintiffs allege that the Congressional mandate embodied in the FY 1976 appropriations act requires an actual expenditure of $187.5 million during the year, and that defendants' limitation of actual expenditures to approximately $160 million amounts to an illegal impoundment of funds. Plaintiffs further allege that Title VII of the Older Americans Act requires defendants to make all funds available to the parties in the year in which they were appropriated and to periodically reallocate funds during that same year in a manner which ensures that the entire appropriation will be spent.

*Conclusions of Law*

■ The court finds that Congress clearly and unequivocally intended the Labor-HEW Appropriations Act for Fiscal Year 1976 to result in the actual expenditure of $187.5 million during the 12 months to which it applied. Defendants' contention that Congress intended to mandate only a $187.5 million annualized rate of expenditure is completely at odds with the act's legislative history. Plaintiffs have cited to the court numerous statements by Senators and Congressmen, made both at the time the appropriations bill was voted on in December and the time the President's veto was overridden in January, which plainly indicate that the full $187.5 million was to be expended during FY 1976.[3]

Representative Pepper, Chairman of the Select Committee on Aging's Subcommittee on Health and Long Term Care, stated,

[T]he bill *requires* the Secretary of Health, Education and Welfare use carry-over funds so that the "level of operations for the nutrition program for the elderly shall be $187.5 million per annum." *The benefit of this requirement that $187.5 million be spent in fiscal year 1976* will be felt by many of our elderly citizens who have not been able to take advantage of the nutrition benefits offered under title VII.

I hope the President will waste no time in signing this bill into law since we are already well into this fiscal year. *As soon as the bill is enacted, we expect HEW to increase immediately the rate of expenditure to the amount that is neces-*

1. *See* Program Instruction AoA–PI–76–14, Defendants' Motion to Dismiss, Exhibit 1.

2. Plaintiffs have filed a motion to drop one named plaintiff, Ollie Carpenter, from the action. The motion was not opposed and will be granted.

3. The original version of the appropriations bill, H.R. 8069, did not mandate an expenditure level. The Senate version of the bill mandated expenditure of $200 million. H.R. 8069, as reported out by the Senate Committee on Appropriations, at 39. The compromise which emerged from conference was that the House would assent to inclusion of an expenditure mandate but that the level would be reduced to $187.5 million. *See* Conf.Rep.No.94–689, 94th Cong., 1st Sess. 16–17 (1975). Aside from the reduction in the expenditure, the language of the appropriation bill as enacted is identical to that reported out by the Senate Committee.

*sary so that the entire $187.5 million will be spent in this fiscal year.* The Senate bill had mandated that $200 million be spent in fiscal 1976, but the House conferees lowered this amount by $12.5 million. *In so doing, however, the conferees recognize the importance of HEW's implementing immediately our mandate, and we expect that the Department will inform the States of the new spending levels which will accomplish the expenditure of the full $187.5 million by the end of this fiscal year.*

121 Cong.Rec. H12014 (daily ed., Dec. 8, 1975) (emphasis added).

Senator Eagleton declared,

By directing that the program's "level of operations" be increased to $187.5 million, we, in essence, require the expenditure of $62.5 million in funds carried over from previous years, plus the $125 million appropriated in this bill so that local agencies spend $187.5 million during the course of fiscal 1976.

121 Cong.Rec. S21389 (daily ed., Dec. 8, 1975).

Other similar expressions of Congressional intent abound. *See, e. g.,* Sen.Rep.No. 94–366, 94th Cong., 1st Sess. 86 (1975); 121 Cong.Rec. S16273 (daily ed., Sept. 18, 1975) (statement of Sen. Eagleton); 121 Cong. Rec. S16160 (daily ed., September 17, 1975) (statement of Sen. Kennedy); 121 Cong. Rec. S16274 (daily ed., Sept. 18, 1975) (statement of Sen. Schweiker); 121 Cong.Rec. S16115 (daily ed., Sept. 17, 1975) (statement of Sen. Pastore); 121 Cong.Rec. S16160 (daily ed., Sept. 17, 1975) (statement of Sen. Bayh); 121 Cong.Rec. S16161 (daily ed., Sept. 17, 1975) (statement of Sen. Tunney); 121 Cong.Rec. 16162 (daily ed., Sept. 17, 1975) (statement of Sen. Pell); 121 Cong. Rec. S16162 (daily ed., Sept. 17, 1975) (statement of Sen. Clark); 121 Cong.Rec. S16163 (daily ed., Sept. 17, 1975) (statement of Sen. Chiles); 121 Cong.Rec. S16138 (daily ed., Sept. 17, 1975) (statement of Sen. Magnuson); 121 Cong.Rec. S16168 (daily ed., Sept. 17, 1975) (statement of Sen. Percy); 121 Cong.Rec. S16274 (daily ed., Sept. 18, 1975) (statement of Sen. Church); 121 Cong.Rec. S21605 (daily ed., Dec. 10, 1975) (statement of Sen. Clark); 122 Cong.Rec. H330 (daily ed., Jan. 27, 1976) (statement of Rep. Hawkins); 122 Cong.Rec. H330 (daily ed., Jan. 27, 1976) (statement of Rep. Rangel); 122 Cong.Rec. S730 (daily ed., Jan. 28, 1976) (statement of Sen. Percy).

In the face of this remarkably unambiguous legislative history, defendants nevertheless maintain that Congress could not have intended that $187.5 million actually be spent between January 28, and June 20, 1976 because the annualized level of operation which would have resulted could not have been sustained during subsequent years. According to their own calculations, however, the annualized rate which would have resulted from spending the entire sum during the final five months of the fiscal year would have been $240 million. Since the authorized appropriation level for FY 1977 is $250 million, it is not unreasonable to assume that Congress realized the magnitude of the increase, but felt able to sustain the program in following years.

Defendants also rely on a letter sent by Senator Warren Magnuson to HEW on March 29, 1976. In the letter, Senator Magnuson, chairman of the Senate subcommittee which handled the appropriations bill for the nutrition program, expressed apprehension that expenditure of the full appropriation in the remainder of FY 1976 would result in too high an annualized rate of operation. The Senator noted, "In the past I have been critical of the Administration's slowness in building up to Congressionally-mandated spending levels for this program. While this continues to be a concern, it also appears possible that the sudden release of additional funds late in fiscal 1976 to raise obligations from the current $150,000,000 level to $187,500,000 could result in the States spending at a rate much higher than $187,500,000 on an annualized basis. . . . Please let me know your plan to insure that the nutrition program for the elderly will be expanded quickly to the $187,500,000 program spending level without building State spending rates to a much higher level which could not be sus-

tained." Letter of Senator Warren G. Magnuson to F. David Mathews, March 29, 1976, Defendants' Motion to Dismiss, Exhibit 2.

■ Senator Magnuson's letter does not aid defendants' case. First, the letter is not properly considered legislative history. This is especially so when a wealth of contemporaneous interpretations of the appropriations act, including statements by Senator Magnuson, himself, are in the record. Second, when the substance of the letter is examined, it fails to support defendants' construction of the statute. The underlying assumption of the letter is that HEW had the power to allow the expenditure of all $187.5 million in 1976. If this were not the case, the letter would not have been necessary at all. Further, the letter does not recommend that an annualized rate of only $187.5 million be reached, but that the annualized rate be kept at a level which could be sustained by future appropriations. Since Congress has increased the program's appropriation every year, such a level could be considerably above $187.5 million. Finally, it must be remembered that Senator Magnuson did not write the letter until the end of March, 1976. By this time all concerned parties realized that expenditure of the full $187.5 million in FY 1976 was not possible. The existence of this dilemma, however, is solely the fault of defendants, whose conduct obviously reflects the President's hostility to the nutrition program. Thus, Senator Magnuson's letter indicates concern for the problem defendants created, but it also reaffirms Congress' general intent of immediately increasing the program's spending level to the maximum amount future appropriations could reasonably be expected to support.

■ In addition to finding that the Labor-HEW Appropriations Act for FY 1976 was designed to make available the total sum of $187.5 million, the court finds that Title VII of the Older Americans Act does not provide defendants with any authority to prohibit expenditure of funds appropriated for the nutrition program. The court further finds that Title VII places a mandatory obligation on defendants to reallocate funds from states not spending their entire yearly share to states willing to spend in excess of their entire share, thereby ensuring that all funds appropriated for a given fiscal year will be spent during that year.

Title VII's provisions for the allocation of appropriations are contained in sections 703(a) and 703(b). Subsection (a)(1) of section 703 provides, in relevant part,

> From the sums appropriated for any fiscal year under section 3045g of this title, each State *shall be allotted* an amount which bears the same ratio to such sum of the population age 60 or over in such State bears to the population aged 60 or over in all States . . . .

42 U.S.C. § 3045b(a) (emphasis added).

Subsection (b) of section 703 provides, in relevant part,

> The amount of any State's allotment under subsection (a) of this section of any fiscal year which the Commissioner [of the Administration on Aging] determines will not be required for that year *shall be reallotted*, from time to time and on such dates *during such year* as the Commissioner may fix, to other States in proportion to the original allotments to such States under subsection (a) of this section for that year, but with such proportionate amount for any of such other States being reduced to the extent it exceeds the sum the Commissioner estimates such State needs and will be able to use for such year; and the total of such reductions *shall be similarly* reallotted among the States whose proportionate amounts were not reduced.

42 U.S.C. § 3045b(b) (emphasis added).

Defendants concede that section 703(a) requires HEW to allocate all appropriated funds, but argue that the section does not prohibit them from simultaneously limiting the amount of funds states may spend out of their allocations. The court can perceive no meaningful distinction between not allocating funds and allocating them while prohibiting their expenditure. Consequently, the court concludes that defendants have no statutory authority to withhold funds appropriated to the nutrition program.

Defendants also argue that even if all funds must be made available to the states without limitation, HEW need not attempt to ensure expenditure of the full amount by reallocating funds from nonspending states to spending states. Defendants conclude that the power to reallocate provided in section 703(b) is discretionary because mandatory reallocation within one year would conflict with section 708 of the Older Americans Act, which provides, in relevant part,

Sums appropriated pursuant to this section which are not obligated and expended prior to the beginning of the fiscal year succeeding the fiscal year for which such funds were appropriated shall remain available for obligation and expenditure during such succeeding fiscal year.

42 U.S.C. § 3045g.

The court cannot accept defendants' tortured statutory construction. There is no indication either in the Act or its legislative history indicating that sections 703 and 708 were to be interrelated. The most logical interpretation of the statute is that section 703 alone governs allocation between the states while section 708 governs allocation of authorized appropriations between fiscal years. Under this construction of the act, it becomes clear that the function of section 708 was to allow the program to become forward funded in the event its implementation was delayed. When section 703(b) is read alone, rather than in conjunction with section 708, it clearly places a mandatory obligation on HEW to reallocate funds within a given fiscal year in a manner which ensures full expenditure of the yearly appropriation.

■ There is no longer any doubt that in the absence of express Congressional authorization to withhold funds appropriated for implementation of a legislative program the executive branch must spend all funds. *See* Impoundment Control Act of 1974, 31 U.S.C. § 1301. *See also Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975). Since Congress appropriated $187.5 million for expenditure in FY 1976 on the Title VII nutrition program, since Title VII does not authorize the executive branch to prohibit the expenditure of any appropriated funds, and since the executive branch lacks any inherent power to impound funds, the court must grant plaintiffs injunctive relief forcing all funds to be made available. Further, since Title VII places a duty on defendants to ensure that the states spend all the appropriated funds and since defendants have failed to fulfill this obligation in the past, the court will order defendants to obey this statutory command.

The problem which remains is how to schedule the expenditure of the funds not yet spent in FY 1976 in a manner which fulfills Congress' intent of quickly increasing the nutrition program's level of operation, yet keeps that level low enough to be maintained in the future. Plaintiffs have recommended that the most reasonable solution to this dilemma is to ensure that the portion of the $187.5 million not spent in FY 1976 be spent by the end of FY 1977, in addition to all funds appropriated specially for FY 1977. The court views this suggestion as sound and will issue an order which (1) ensures that defendants provide an accounting of the total Title VII funds expended in FY 1976 by state agencies administering the nutrition program, (2) ensures that state agencies will be informed by the defendants that Title VII expenditures during the Transition Quarter and FY 1977 will include all expenditures mandated by Congress for the Transition Quarter, plus whatever expenditures Congress mandates for FY 1977, plus the difference between $187.5 million and the total amount of funds the defendants' accounting reflects was actually expended by the states in FY 1976, (3) ensures that the defendants will release fiscal year 1976, Transition Quarter, and FY 1977 Title VII appropriations to the states sufficiently early to allow for the actual expenditure of these monies by the end of FY 1977, and (4) ensures the reallocation of these appropriations from states who are not spending their allocations to states that will spend such allocations at a point in time during FY 1977 that will allow the latter states to spend such allocations by the end of FY 1977.

Since the court finds that the class proposed by plaintiffs meets all the requirements of Rule 23(a) and (b)(2), the order will also grant plaintiffs' motion for class certification. Fed.R.Civ.P. 23.