**STATE OF MAINE, Plaintiff,**

v.

**Neil GOLDSCHMIDT, Secretary of Transportation of the United States, Defendant.**

**Civ. No. 80–0130 P.**

United States District Court, D. Maine.

June 6, 1980.

Richard S. Cohen, Atty. Gen., John M. R. Paterson, Deputy Atty. Gen., John B. Wlodkowski, Thomas G. Reeves, Maine Dept. of Transp., Legal Division, Augusta, Me., for plaintiff.

Paula D. Silsby, Asst. U. S. Atty., Portland, Me., Gregory D. Wolfe, Dept. of Transp., S. James Wiese, Richard A. Levie, Dept. of Justice, Federal Programs Branch, Washington, D. C., for defendant.

## OPINION AND ORDER

GIGNOUX, District Judge.

On April 23, 1980, the State of Maine filed this action against the defendant Secretary of Transportation (the Secretary) seeking a declaratory judgment and injunctive relief enjoining the Secretary "from rescinding, reducing, deferring, impounding or otherwise refusing to make available for obligation" Federal-aid highway funds legally apportioned to the State for the fiscal year (FY) 1980 pursuant to the Federal-Aid Highway Act of 1956, as amended, 23 U.S.C. § 101 et seq. (the Highway Act). The Court has jurisdiction of the action under 28 U.S.C. § 1331(a), and venue lies in this District pursuant to 28 U.S.C. § 1391(e). On May 16, 1980, this Court (Mitchell, J.) granted plaintiff's motion for a temporary restraining order and directed the Secretary to maintain a fund in an amount sufficient to satisfy Maine's estimated obligations for the remainder of this fiscal year pending a final hearing on the merits. By agreement of the parties, the restraining order is to remain in effect until June 6, 1980. · The trial on the merits has been advanced and consolidated with the hearing on the application for a preliminary injunction, Fed.R. Civ.P. 65(a)(2), and the case has been submitted on a stipulated record. The issues have been fully briefed and ably argued by counsel, and this opinion contains the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## I

The Highway Act established a system of grants-in-aid to the States to finance a part of the cost of constructing highways in the Federal-aid highway system. 23 U.S.C. § 103. For Interstate projects, the amount of the federal contribution is, in most cases, 90%; for primary, secondary and urban projects, 75%; and at other rates for other categories of projects. 23 U.S.C. § 120. The Act is administered by the Secretary through the Federal Highway Administration (the FHWA).

The Act provides for a complex funding method. Congress authorizes the expenditure of funds for each fiscal year (October 1–September 30) in periodic appropriations acts. See Note fol. 23 U.S.C. § 101. At the beginning of each fiscal year, the Secretary apportions the annual authorization of funds from Congress among the States in accordance with a formula set forth in 23 U.S.C. § 104(b). Upon apportionment, each State is notified of its share of the national authorization. Once apportioned to a State, the apportioned amount is for its exclusive use, and may be "carried over" for one additional fiscal year (Interstate authorizations) or for three additional fiscal years (non-Interstate authorizations). 23 U.S.C. § 118(b). The apportionment for the current fiscal year, together with its "carry-over" apportionments from prior years, constitute the State's available apportionment at the beginning of the year.

The States must follow the statutorily prescribed procedure to receive federal grants. At the beginning of each fiscal year, the State submits for FHWA's approval a program of projects for which federal funds are desired. Id. § 105. If FHWA approves the program, the State submits specific projects for approval. Id. § 106(a). FHWA approves those projects meeting the requirements of 23 U.S.C. § 109. Id. § 106(a). Approval of an individual project creates a contractual obligation of the United States to pay the federal share of the cost of constructing the project. Id. Upon project approval, the State is permitted to obligate the apportioned funds by entering into construction contracts. The State then is reimbursed for actual expenditures as it submits vouchers for work completed. The required funds are paid out of liquidating appropriations, provided by annual appropriations acts. Thus, an obligation created in one year normally has actual expenditure impact on the federal budget in ensuing fiscal years.

In addition to its annual authorization for appropriation, Congress sets a limit on the total amount of the apportioned budget authority which may be obligated by the States in each fiscal year. This "obligational ceiling" limits the rate of obligation of

authorized funds nationwide, and this ceiling, rather than the total of the States' unused apportionments, becomes the constraint on the national program.

There is no statutorily prescribed procedure for the apportionment of the obligational ceiling similar to the procedure prescribed for the apportionment of the authorized funds by 23 U.S.C. § 104. FHWA has used two different administrative procedures for allocating obligational authority in the recent past. From 1966 to 1975 the total was prorated so that each State had a specific amount available to it each year. Since 1975, FHWA has obligated funds on a first-come, first-served basis. Thus, if the total of all projects approved nationwide reaches the obligational ceiling, further project approvals in all States are halted. The ceiling has in fact been reached only once, in early September 1979, but since a new ceiling became effective as of October 1, the disruptions in States' programs for less than a month were not serious.

For FY 1980 Congress authorized expenditure under the Act of $8.9 billion, of which the Secretary apportioned $7.9 billion among the States according to the formula provided in 23 U.S.C. § 104.[1] Congress then imposed an obligational limit of $8.75 billion. The new apportioned authorization, when combined with "carryovers" from prior years, established a total apportioned budget authority of $13.6 billion. Maine's apportioned share of the $7.9 billion FY 1980 authorization is $49 million. In addition, Maine began FY 1980 with $29.3 million of carryover funds, for an aggregate apportionment of $78.3 million for the year.

In March 1980 the President announced his intention, as an anti-inflation measure, to balance the FY 1981 budget and directed the federal agencies to propose program reductions. On March 14 FHWA, in accordance with the direction of the President, temporarily halted all project approvals. On April 2 FHWA determined to defer $1.15 billion of the remaining FY 1980 obligational authority, reducing the obligational ceiling from $8.75 billion to $7.6 billion, and the President submitted to Congress the deferral message required by Section 1013, 31 U.S.C. § 1403, of the Congressional Budget and Impoundment Control Act of 1974, 31 U.S.C. § 1301 *et seq.* (the Impoundment Control Act).[2] By March 14 approximately $5.5 billion of the $8.75 billion available for the year had already been obligated, leaving a balance of approximately $3.2 billion. Upon the reduction of the obligational ceiling from $8.75 billion to $7.6 billion the remaining obligational authority amounted to $2.04 billion. On April 2 FHWA released three-quarters of the remaining authority for project approvals, with the final release of the remaining one-quarter scheduled for August 1.

FHWA administratively determined to allocate the remaining obligational authority by a new procedure. It adopted a formula that allocated the $2.04 billion to the States in accordance with the percentages derived from 23 U.S.C. § 104, and applied the percentages from that formula to the remaining $2.04 billion in unobligated authority, instead of to the $7.6 billion in obligational authority available for the fiscal year.

The combined effect of the reduction in obligational authority and the new allocation formula was to reduce substantially the amount of obligational authority available to Maine for FY 1980. Maine's obligational authority for the remainder of the year was reduced to $11.7 million. As of March 14, Maine had obligated $20.1 million

---

1. Before apportionment, deductions from the total authorized for appropriation are made for administrative expenses and research, 23 U.S.C. § 104(a), for urban transportation planning activities, *id.* § 104(f)(1), and for certain other purposes.

2. Congress has not yet acted on the deferral message. Deferral No. D80–61. On May 9, 1980, the House Appropriations Committee submitted a bill, H.R. 7325, to the Committee of the Whole House which would, *inter alia*, disapprove the proposed deferral, set a new FY 1980 obligational ceiling of $7.9 billion, and prevent any State from receiving funds in excess of its percentage share of $7.9 billion. *See* H.R.Rep. No. 96–934, 96th Cong. 2d Sess. 1, 174–75 (1980).

of the $78.3 million available to it for FY 1980, leaving an unobligated apportionment of $58.2 million. As a result, Maine is now unable to spend $46.5 million of its available apportionment during this fiscal year. Maine states that it had intended to obligate $39.8 million during the remainder of the year.

In the present action, Maine challenges the legal authority of the Secretary administratively to reduce the obligational limit established by Congress for the current fiscal year. Alternatively, Maine challenges the method used by FHWA to allocate the remaining obligational authority among the States. Similar actions have been filed in Alaska, Arkansas, California, New Mexico and Vermont.[3]

## II

■ The question of the lawfulness of the President's deferral of $1.15 billion in obligational authority made available to the States by Congress under the Highway Act requires consideration of the interplay between that Act and the Impoundment Control Act. There is no dispute that the Highway Act itself does not provide the President with that authority. *See State Highway Commission v. Volpe*, 479 F.2d 1099 (8th Cir. 1973). *Volpe* unequivocally established that, in the absence of other statutory authority, the President may not defer authority to obligate highway funds previously apportioned to the States under the Highway Act for reasons related to the status of the economy and the need to control inflationary pressures. *Id.* at 1118. *See also Iowa v. Brinegar*, 512 F.2d 722 (8th Cir. 1975); *Minnesota v. Coleman*, 391 F.Supp. 330 (D.Minn.1975); *Louisiana v. Brinegar*, 388 F.Supp. 1319 (D.D.C.1975); *Montana v. Brinegar*, 380 F.Supp. 861 (D.Mont.1974). Moreover, in 1973, in the Conference Report on the Federal-Aid Highway Act of 1973, Pub.L. No. 93–87, 87 Stat. 250 (1973), Congress specifically affirmed its "complete agreement" with the decision in *Volpe* that impoundment of highway funds was not authorized by the Highway Act. *See* S. Conference Rep. No. 93–355, 93d Cong., 1st Sess. (1973), *reprinted in* U.S.Code Cong. & Admin.News 1973, pp. 1939, 1976.[4]

■ The Secretary contends, however, that the Impoundment Control Act, upon which the President relied to support the deferral, provides an independent statutory basis for the President's action.[5] Maine

---

**3.** As of this writing, the plaintiff States have prevailed in Arkansas, New Mexico and Vermont. *New Mexico v. Goldschmidt*, Civ. No. 80–247–HB (D.N.M. May 22, 1980) (preliminary injunction granted); *Arkansas v. Goldschmidt*, 492 F.Supp. 621 (E.D.Ark. 1980) (declaratory judgment and permanent injunction issued); *Vermont v. Goldschmidt*, Civil Action File No. 80–115 (D.Vt. May 19, 1980) (preliminary injunction granted). The Secretary has prevailed in Alaska. *Alaska v. Goldschmidt*, No. A80–140 Civil (D.Alaska May 21, 1980) (defendant's motion for summary judgment granted). No hearing has been held in California.

**4.** The cited Conference Report on the 1973 Highway Act Amendments contains the following language:

PROHIBITION OF IMPOUNDMENT
*Senate Bill*
This section would prohibit the impoundment of sums authorized to be apportioned by section 104 of title 23, U.S.Code, which have been appropriated by Congress except specific sums determined by the Secretary of the Treasury as necessary to meet future expenditures from the Highway Trust Fund.

*House Amendment*
No comparable provision.
*Conference Substitute*
No comparable provision. *The fact that this section of the Senate bill is not contained in the conference substitute shall not be construed to indicate anything other than complete agreement with the decision of the United States Court of Appeals for the Eighth Circuit in the case of the State Highway Commission of Missouri v. John A. Volpe, Secretary of Transportation of the United States, et al.*
*Id.* at 1976. (emphasis supplied)

**5.** The Secretary also argues that judicial review of the deferral is foreclosed when the President has deferred funds in accordance with the Impoundment Control Act and Congress acquiesces in the deferral. In view of the Court's conclusion, *infra*, that the Impoundment Control Act does not apply to the Highway Act, there is no foundation for this contention. Moreover, it cannot be seriously questioned that it is the role of the courts to determine whether executive officials have complied with the law; nor can it be doubted that a challenge to the Presi-

responds that the disclaimer section of the Impoundment Control Act, 31 U.S.C. § 1400, precludes its application to the Highway Act.[6] The Court agrees.

The Impoundment Control Act was enacted by the Congress as part of the Congressional Budget and Impoundment Control Act of 1974, Pub.L. No. 93–344, 88 Stat. 297 (1974), *reprinted in* U.S.Code Cong. & Admin.News 1974, p. 326, 31 U.S.C. §§ 1301 *et seq.*, in an effort to resolve disagreement between the Executive and Legislative branches over which has ultimate control of government program and fiscal spending policies. *See* Decision of the Comptroller General B–115398 (December 4, 1974), 54 Comp.Gen. 453, 453–54 (1974) (the 1974 Comptroller's Decision). The Act was designed to strengthen congressional control over impoundments and establish a procedure by which Congress could review Executive impoundments. *Id.* Under the Act, the President must report to the Congress all budget authority which he proposes to be withheld from obligation or expenditure, either permanently or temporarily. *See* 31 U.S.C. § 1404. A "rescission," or permanent withdrawal of budget authority, must be affirmatively approved by both Houses of Congress within 45 days. *Id.* § 1402. A "deferral", or temporary withdrawal of budget authority within a fiscal year, must be made available for obligation if either House of Congress passes an impoundment resolution disapproving the proposed deferral. *Id.* § 1403.

Section 1001 of the Act, *id.* § 1400, is a disclaimer section. It reads as follows:

*Nothing contained in this Act, or in any amendments made by this Act, shall be construed as—*

(1) asserting or conceding the constitutional powers or limitations of either the Congress or the President;

(2) ratifying or approving any impoundment heretofore or hereafter executed or approved by the President or any other Federal officer or employee, except insofar as pursuant to statutory authorization then in effect;

(3) affecting in any way the claims or defenses of any party to litigation concerning any impoundment; or

*(4) superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder.* (emphasis supplied)

Subsection (4) of Section 1400, the fourth disclaimer, specifically excepts from the application of the Impoundment Control Act any law "which requires the obligation of budget authority or the making of outlays thereunder." There has been no authoritative judicial interpretation of this Section.[7] The plain and unambiguous language of the statute, however, makes clear the congressional intent that the provisions of the Impoundment Control Act shall not apply to any other act which mandates the obligation or expenditure of funds.[8] The

dent's decision to impound funds which Congress has by law made available for expenditure presents a justiciable issue. *See Train v. City of New York,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); *State Highway Commission v. Volpe, supra* at 1106–07; *National Council of Community Mental Health Centers v. Weinberger,* 361 F.Supp. 897, 900–01 (D.D.C.1973).

**6.** The State also makes two additional arguments: first, that the Impoundment Control Act is merely a procedural act which provides no substantive authority for executive impoundments, but rather establishes a procedure for congressional review of impoundments which are substantively authorized by some other statute; second, that the President's action in the present case constitutes a "rescission," to which Section 1012 of the Act, 31 U.S.C. § 1402, applies, rather than, as the Presi-

dent claims, a "deferral" under Section 1013, 31 U.S.C. § 1403. The Court need not reach these issues because of its conclusion, *infra* with respect to the effect of the disclaimer section.

**7.** Two federal district courts recently have interpreted the fourth disclaimer to preclude impoundments of obligational authority under the Highway Act. *New Mexico v. Goldschmidt, supra* note 3, slip op. at 6–12; *Arkansas v. Goldschmidt, supra* 492 F.Supp. at 627–628 note 3. *But see Alaska v. Goldschmidt, supra* note 3.

**8.** The fourth disclaimer did not appear in either the Senate bill, S. 1541, *see* S. Conference Rep. No. 93–924, 93d Cong., 2d Sess. (1974), *reprinted in* U.S.Code Cong. & Admin.News 1974, pp. 3591, 3616; S.Rep.No. 93–688, 93d Cong., 2d

Highway Act is such a law. *State Highway Commission v. Volpe, supra.* The Impoundment Control Act, therefore, cannot provide an independent statutory basis for the deferral challenged in this case.[9]

The Secretary makes a number of arguments, which the Court finds unpersuasive.

■ The Secretary argues that the Highway Act does not "require the obligation of budget authority or the making of outlays thereunder," but simply authorizes the approval of highway projects which in turn creates a federal obligation. But this issue has been previously settled by *State Highway Commission v. Volpe, supra,* which held that the Secretary had no authority to withhold highway funds for reasons extrinsic to the Highway Act, *id.* at 1112–14, 1118, a decision with which Congress has expressed its "complete agreement."

■ The Secretary argues that the fourth disclaimer in the Impoundment Control Act does not apply to the Highway Act because it is directed solely to "entitlement authority" as defined in 31 U.S.C. § 1351, and not to the type of spending authority created by the Highway Act. Entitlement programs are those in which Congress has created a statutory right for beneficiaries to receive government payments. Section 1351 defines "entitlement authority" as authority derived from those provisions of law

under which the United States "is obligated to make . . . payments to persons . . . who meet the requirements established by . . . law." *Id.* § 1351(c)(2)(C). The fourth disclaimer, on the other hand, speaks to a law which "requires the obligation of budget authority or the making of outlays thereunder." The Secretary's argument is completely undercut by the substantial difference between the language of the fourth disclaimer and the definition of "entitlement authority" in Section 1351. The disclaimer refers to laws which require the obligation of budget authority; Section 1351 refers to laws which require the payment of funds.

■ The Secretary argues that the entire disclaimer in the Impoundment Control Act was intended solely as a temporary measure to avoid prejudicing then pending litigation over the impoundment issue. In support of this argument, he points to a 1977 Comptroller General's Report to the Congress, in which the Comptroller General describes the disclaimer section as a "transitional provision whose objectives have been realized," and recommends its repeal. *See* Report to the Congress by the Comptroller General of the United States, Review of the Impoundment Control Act of 1974 (June 3, 1977) (OGC 77 20) (the 1977 Comptroller's Report).[10] But Congress did not act on the

---

Sess. (1974), *reprinted in* U.S.Code Cong. & Admin.News 1974, pp. 3504, 3572–75, or the House bill, H.R. 7130. *See* 119 Cong.Rec. 39721–40 (1973). Section 1001(4) was apparently added in the conference. But it was not specifically mentioned in the conference report. S. Conference Rep. No. 93–924, 93d Cong., 2d Sess. (1974), *reprinted in* U.S.Code Cong. & Admin.News, 1974, pp. 3591, 3616–18. In the subsequent congressional debate, *see* 120 Cong.Rec. 19671–99, 20464–86, 20500, the only mention of the fourth disclaimer was the following statement by Senator Ervin, the Senate sponsor of the final bill:

The [fourth] disclaimer . . . disavows any intention by Congress to supersede any law which requires the mandatory obligation of budget authority, since several such statutes have been enacted in response to the wholesale impoundment of funds appropriated for specific programs.

Remarks of Sen. Ervin, *id.* at 20465.

**9.** As this Court has previously observed,

A departure from the plain meaning of statutory language is only justified where the application of literal language would be at variance with legislative intent as revealed by the statute as a whole and its legislative history. *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649, 656 (D.Me.), *aff'd,* 528 F.2d 370 (1st Cir. 1975). *See also Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); *United States v. New England Coal & Coke Co.,* 318 F.2d 138, 142–43 (1st Cir. 1963); 2A Sands, Sutherland Statutory Construction § 46.01 (4th ed. 1973).

**10.** The 1977 Comptroller's Report states in part:

SECTION 1001 [1400]
RECOMMENDATION: *Repeal Section 1001*
Section 1001 was enacted to make clear that passage of the act was not intended to affect: (1) constitutional claims of the President or the Congress on impoundment pow-

Comptroller General's recommendation. And in the report itself, contrary to the Secretary's position in this case, the Comptroller General states his understanding that "Section 1001 [31 U.S.C. § 1400] was enacted to make clear that passage of the act was not intended to affect . . . (3) laws mandating the expenditure of budget authority in response to previous impoundments." See note 10 supra. Moreover, he goes on to state that repeal of the disclaimer section would not affect the Act because "the President generally is complying with those laws requiring the expenditure of funds." Id. This is precisely the question the Court is being asked to determine in this case.

Finally, the Secretary argues that the Court's interpretation of the fourth disclaimer is inconsistent with the 1974 Comptroller's Decision, supra, which has been undisturbed by Congress for over five years.[11] In that Decision, the Comptroller General gave his opinion that the Impoundment Control Act provides independent statutory authorization for Presidential impoundments. Id. at 460–68. Assuming, arguendo, that this opinion is correct, see note 6 supra, the 1974 Comptroller's Decision does not specifically address Subsection (4) of Section 1400 or offer any interpretation or explanation of the effect of that subsection on laws, such as the Highway Act, which prohibit Executive impoundments. Moreover, while it is true that Congress, relying on the Comptroller General's opinion, has

never challenged an impoundment on the ground that it was not authorized by law, there is no indication that Congress has ever been called upon to consider the implications of the fourth disclaimer.

Being persuaded that the disclaimer contained in Subsection (4) of Section 1400 of the Impoundment Control Act precludes the application of that Act to the Highway Act, the Court holds that the Secretary does not have the legal authority to reduce the obligational limit for the current fiscal year established by Congress under the Highway Act.

### III

The present record does not permit the Court to address Maine's challenge to the procedure used by FHWA to allocate among the States the $2.04 billion obligational authority which remained following the Secretary's improper impoundment of $1.15 billion of FY 1980 obligational authority. Maine does not contend that FHWA does not have the power administratively to allocate obligational authority among the States for the remainder of this fiscal year. Maine's contention is that the allocation method selected by FHWA was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and therefore should be set aside by the Court pursuant to Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). See Citizens to Preserve Overton Park v. Volpe,

---

ers, (2) pending lawsuits challenging impoundments, or (3) laws mandating the expenditure of budget authority in response to previous impoundments.

Section 1001 was a transitional provision whose objectives have been realized and, therefore, repealing it would not affect the act. For example, the lawsuits that were pending at the time of the passage of the act have now ended, the President generally is complying with those laws requiring the expenditure of funds, and the constitutional impasse between the Congress and the President over the power to impound that precipitated passage of the act in the first place has abated. Accordingly, there is no reason that section 1001 need be retained.

Furthermore, the disclaimers of section 1001 have been variously interpreted. What-

ever—if any—purpose they still serve would be clarified by amendments to the main body of the act.

Id. at 10–11.

11. The 1977 Comptroller's Report noted that the President had reported 277 impoundments to the Congress under the Impoundment Control Act between mid-1974 and September 30, 1976, of which 120 were temporary impoundments without any statutory basis other than Section 1013 of the Act. See id. at 15. Thirty-seven of these policy deferrals were overturned under the procedures established by the Act. See id. The record before this Court further discloses that since October 1, 1976, the President has submitted 80 deferrals under Section 1013 of the Act; Congress has disapproved only eight of these.

401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *City of Los Angeles v. Adams*, 556 F.2d 40 (D.C. Cir. 1977).

 The appropriate standard for judicial review under the Administrative Procedure Act of discretionary agency action has been stated by the Supreme Court as follows:

[T]he Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park v. Volpe, supra* 401 U.S. at 416, 91 S.Ct. at 823–824 (citations omitted). Since the Court has determined that the Secretary's impoundment action was unlawful, the factors relevant to FHWA's determination of the appropriate allocation method to be used may be substantially different from those upon which FHWA based its choice of the current method. As a result, it will be necessary for the FHWA to reevaluate its determination. In these circumstances, it would be inappropriate for the Court to review the present allocation method, which may well be superseded by a different formula in light of this Court's decision.

Maine is justifiably concerned that it may lose FY 1980 obligational authority to which it is entitled because the national obligational ceiling will be reached by commitments to other States before FHWA was redetermined the allocation formula and any court challenge thereto has been adjudicated. In order to assure that Maine will not be prejudiced by the delay which will result from administrative and judicial proceedings, the parties have agreed that the defendant will report within 14 days to the Court and plaintiff the formula proposed to be used for allocation of the obligational authority to Maine for FY 1980; that plaintiff may within five days thereafter file and serve any objections thereto; and that any further judicial proceedings shall be expedited. The Court will further

order that the Secretary not take any action that would affect the availability during the remainder of FY 1980 to Maine of obligational authority in the amount of $39.8 million. Finally, the Court will reserve jurisdiction over this action pending its further order.

## IV

A declaratory judgment, injunction and order will be entered in accordance with this Opinion.

IT IS SO ORDERED.