Lorraine DABNEY, Elizabeth Deakyne, Robert and Julie McGibbon, City of Philadelphia, City of Saint Paul, Honorable Stephen L. Neal, M. C., Honorable Stewart B. McKinney, M. C., Honorable S. William Green, M. C., Solar Lobby, Natural Resources Defense Council, League of Women Voters, National Audubon Society, NYPIRG/Citizens Alliance, National Association of Solar Contractors, First Hub Credit Union, Wayne and Susan Nichols, Michael N. Corbett, Harry K. Schwartz, Paul W. Sullivan, Joseph Honick, State of New York, Plaintiffs,

v.

Ronald REAGAN, David A. Stockman, Samuel R. Pierce, James B. Edwards, Donald T. Regan, John R. Block, and Malcolm Baldridge, in their official capacities, and the United States Department of Housing and Urban Development, Defendants.

No. 82 Civ. 2231 CSH.

United States District Court,
S. D. New York.

June 29, 1982.

Steven Ferrey, Nat. Consumer Law Center, Boston, Mass., Alan Miller, Natural Resources Defense Council, Washington, D. C., Eric Goldstein, Natural Resources Defense Council, New York City, Andre Dasent, Philadelphia, Pa., Ken Robinson, State of New York, Asst. Atty. Gen., New York City, for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., John S. Martin, U. S. Atty., New York City, Alphonse M. Alfano, Andrew M. Wolfe, Attys., Dept. of Justice, Civ. Div., Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

On April 8, 1982 plaintiffs commenced this action against President Reagan, David A. Stockman, as Director of the Office of Management and Budget ("OMB"); and the Secretaries of the Departments of Housing and Urban Development ("HUD"), Energy, The Treasury, Agriculture, and Commerce. These are the officers of the Executive branch of government charged with administering the Solar Energy and Energy Conservation Bank Act (the "Act"), which is Title V of the Energy Security Act of 1980, Pub.L.No.96–294, 94 Stat. 611 (1980). Title V is codified at 12 U.S.C. §§ 3601–3620. Plaintiffs pray for a declaratory judgment that defendants are in violation of the Act, and Pub.L.No.97–101, 95 Stat. 1420, which embodied the fiscal year ("FY") 1982 appropriation for the Solar Energy and Energy Conservation Bank (the "Bank"). Plaintiffs also seek preliminary and injunctive relief compelling compliance with these statutes. Jurisdiction is founded upon 28 U.S.C. § 1331(a) (federal question), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. §§ 2201 and 2202 (declaration of rights and injunctive relief). Venue in this Court is proper under 28 U.S.C. § 1391(e). The case is now before the Court on plaintiffs' motion for a preliminary injunction under Rule 65, F.R.Civ.P. Plaintiffs filed that motion on May 18, 1982. An expedited briefing schedule, given the complexity and the public importance of the issues, was directed, and oral argument heard on June 16. The parties agree that the controlling questions are essentially ones of law. The Court, having considered the pleadings, affidavits, exhibits, and briefs and arguments of counsel, now rules on plaintiffs' motion for a preliminary injunction.

I.

The Act establishing the Bank became effective on June 30, 1980. Its declared purpose was to "encourage energy conservation and the use of solar energy, and thereby reduce the nation's dependence on foreign sources of energy supplies, by establishing a Solar Energy and Energy Conservation Bank." 12 U.S.C. § 3601. The Bank was created within HUD. *Id.* at § 3603(a). The Bank is governed by a Board of Directors, consisting of the Secretaries of HUD, Energy, The Treasury, Agriculture, and Commerce, with the Secretary of HUD acting as chairperson. *Id.* at 3604(a), (c). Management and supervision of the affairs of the Bank is vested in the President of the Bank, a position established within HUD, to be filled by an individual appointed by the President of the United States with the advice and consent of the Senate; and by Executive Vice Presidents for Energy Conservation and for Solar Energy, to be appointed by the President of the Bank.

*Id.* at § 3605. The Act also established advisory committees for Energy Conservation and Solar Energy, these committees to consist of five individuals each, drawn from various concerned interests. *Id.* at § 3606.

Section 3607 provides that, subject to other statutory provisions, the Bank may make payments to "financial institutions"[1] for the purpose of providing financial assistance (a) to owners of and tenants in existing residential and multifamily residential buildings for the purpose and installation of residential energy conserving improvements in those buildings; (b) to owners who occupy and tenants in existing commercial and agricultural buildings for the purchase and installation of commercial energy conserving improvements; (c) to owners of existing buildings for the purchase and installation of solar energy systems; (d) to builders of newly constructed or substantially rehabilitated residential buildings that will contain solar energy systems; and (e) to purchasers of new or substantially rehabilitated buildings containing solar energy systems. The financial assistance for solar energy systems or energy conserving improvements may be in the form of a reduction in the principal obligation of a loan or the qualifying portion of a loan or a prepayment of the interest otherwise due on such loan or portion of such loan. In the case of an owner of an existing residential building or a tenant in an existing residential or multifamily residential building, the assistance for residential energy conserving improvements may be in the form of a grant.[2]

After imposing various conditions and limitations which do not here concern us, the Act provides in § 3614 as follows:

> "*Minimum fiscal year expenditures for residential and multifamily residential building improvements*
>
> "(a) An amount equal to not less than 80 percent of the funds appropriated for a fiscal year under the authorization contained in section 3620(a) of this title shall be provided during such fiscal year for financial assistance under this chapter for the purchase and installation of residential energy conserving improvements in residential and multifamily residential buildings.
>
> "*Minimum fiscal year expenditures for residential and multifamily residential building improvements in buildings owned or tenanted by lower-income individuals; availability of funds*
>
> "(b)(1) An amount equal to not less than 15 percent of the funds appropriated for a fiscal year under the authorization contained in section 3620(a) of this title shall be provided during such fiscal year for financial assistance for the purchase and installation of residential energy conserving improvements in residential buildings owned by individuals whose income is less than 80 percent of the median area income, or in multifamily residential buildings with a majority of the dwelling units occupied by such individuals.
>
> "(2) Funds made available during any fiscal year for the provision of financial assistance required by paragraph (1) which are not expended during such fis-

1. The term "financial institution" is defined in § 3602(9) to mean:

   ". . . any lender (including any nonprofit entity and any State or local governmental entity) designated by the Board based on the qualifications established for the insurance of financial institutions under section 1703 of this title, or any utility providing financing for the purchase and installation of residential energy conservation measures in accordance with the requirements of Title II of the National Energy Conservation Policy Act."

   According to the legislative history, the term "financial institution" is intended:

   ". . . to include State and local governments providing loans for housing, rehabilitation,

conservation or solar improvements, and other entities such as Neighborhood Housing Services.

"Furthermore the Conferees expect that in addition to utilities which participate in the Residential Conservation Service Program established in Title II of the National Energy Conservation Policy Act (NECPA), any other utility could qualify as a financial institution if it meets the qualifications as designated by the Board." House Con.Rep.No.96–1104, 1980 U.S.Code Cong. & Adm.News at 1743, 2174.

2. This summary of the provisions in § 3607 is taken from the legislative history, *id.* at 2176.

cal year shall be available during the following fiscal year for the provision of any financial assistance under this chapter for residential and commercial energy conserving improvements."

Section 3615 provides:

*"Minimum fiscal year expenditures for residential and multifamily residential building systems*

"(b) An amount equal to not less than 70 percent of the funds appropriated for a fiscal year under the authorization contained in section 3620(b) of this title shall be provided during such fiscal year for financial assistance under this chapter for the purchase and installation of solar energy systems in residential and multifamily residential buildings and for the purchase of residential and multifamily residential buildings which have such systems.

"Minimum fiscal year expenditures for residential and multifamily residential building systems in buildings owned or tenanted by lower-income individuals; availability of funds

"(c)(1) An amount equal to not less than 5 percent of the funds appropriated for a fiscal year under the authorization contained in section 3620(b) of this title shall be provided during such fiscal year for financial assistance under this chapter for the purchase and installation of solar energy systems in residential buildings owned by individuals whose income is less than 80 percent of the median area income, or in multifamily residential buildings with a majority of the dwelling units occupied by such individuals.

"(2) Funds made available during any fiscal year for the provision of financial assistance required by paragraph (1) which are not expended during such fiscal year shall be available during the following fiscal year for the provision of any financial assistance under this chapter for solar energy systems."

The Board of the Bank is directed to submit an annual report. *Id.* at § 3617. The Act also required the Board, "as soon as practicable, but not later than 180 days

after June 30, 1980," to issue final rules and regulations necessary to implement the Act, except that rules and regulations "with respect to multifamily residential, commercial, or agricultural building" may be issued "not later than 270 days after such date." *Id.* at § 3618.

Finally, § 3620(a) and (b) authorized to be appropriated for the Bank's purposes the following amounts: to provide financial assistance for the purchase and installation of solar energy systems, $100 million for FY 1981, $200 million for FY 1982, and $225 million for FY 1983; and, to provide financial assistance for the purchase and installation of residential and commercial energy conserving improvements, $200 million for FY 1981, $625 million for FY 1982, $800 million for FY 1983, and $875 million for FY 1984.

## II.

This elaborate, ambitious, multi-billion dollar program was enacted during the closing months of the 96th Congress and the administration of President Carter. But the political winds were rapidly changing. In the general election of November, 1980, President Reagan defeated President Carter for re-election, and significant changes took place in the membership of Congress. Despite the Act's generous authorizations of appropriations for the Bank, Congress did not appropriate any money for the Bank until December 17, 1980, when, in the closing weeks of the 96th Congress, it appropriated $125 million for the remainder of FY 1981. That amount was less than one-half of the $300 million authorized by the Act for FY 1981; and the failure of Congress to appropriate any money at all until December 15 necessarily reduced the Bank's early activities to a bare, essentially unfunded minimum. An *ad hoc* bank staff, drawn from individuals already employed by HUD, was assembled during the summer of 1980. That staff began to draft interim regulations for the Bank, required by the Act to be issued by December 27, 1980. The Bank Board of Directors approved a set of interim regulations and submitted them to Con-

gress on December 12 for the 15-day prepublication review required by law; but Congress adjourned without having completed that review, and, in consequence, no regulations had been published when, in January 1981, the 97th Congress convened.

Ten individuals were appointed by the Carter Administration during 1980 to serve on the two Bank advisory committees established by the Act. These committees held one informal meeting, during the last week of the Carter Administration; they have not been convened since that time, although in November, 1980 the Secretary of HUD published charters for the committees in the Federal Register. The original appointees to the advisory committees continue to serve, at least technically, their two and three year terms having not yet expired.

Shortly after taking office, President Reagan directed the heads of all Executive Departments to postpone all pending regulations. Accordingly HUD Secretary Pierce withdrew from Congressional review all unpublished HUD regulations, including the Bank regulations submitted in December 1980. In a February 1981 message to Congress, President Reagan indicated his intention to seek rescission of the FY 1981 appropriation for the Bank. On March 17, 1981 he submitted a formal rescission proposal to Congress pursuant to the Congressional Budget and Impoundment Control Act of 1974 (hereinafter "Impoundment Control Act").

The Impoundment Control Act was enacted by the Congress as part of the Congressional Budget and Impoundment Control Act of 1974, Pub.L.No.93–344, 88 Stat. 297 (1974), reprinted in U.S.Code Cong. & Admin.News 1974, p. 3462, 31 U.S.C. §§ 1301 et seq., in an effort to resolve disagreement between the Executive and Legislative branches over which has ultimate control of government program and fiscal spending policies. See Decision of the Comptroller General B–115398 (December 4, 1974), 54 Comp.Gen. 453, 453–54 (1974) (the 1974 Comptroller's Decision). The Act was designed to strengthen congressional

control over impoundments and establish a procedure by which Congress could review Executive impoundments. Id. Under the Act, the President must report to the Congress all budget authority which he proposes to be withheld from obligation or expenditure, either permanently or temporarily. See 31 U.S.C. § 1404. A "rescission," or permanent withdrawal of budget authority, must be affirmatively approved by both Houses of Congress within 45 days. Id. § 1402. A "deferral," or temporary withdrawal of budget authority within a fiscal year, must be made available for obligation if either House of Congress passes an impoundment resolution disapproving the proposed deferral. Id. § 1403.

Section 1001 of the Act, id. § 1400, is a disclaimer section. It reads as follows:

"*Nothing contained in this Act*, or in any amendments made by this Act, *shall be construed as* —

"(1) asserting or conceding the constitutional powers or limitations of either the Congress or the President;

"(2) ratifying or approving any impoundment heretofore or hereafter executed or approved by the President or any other Federal officer or employee, except insofar as pursuant to statutory authorization then in effect;

"(3) affecting in any way the claims or defenses of any party to litigation concerning any impoundment; or

"(4) *superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder.*" (emphasis supplied).

Anticipating the success of the President's rescission proposal, on March 13, 1981, the Chairman of the Board of the Bank, HUD Secretary Pierce, requested the other members of the Board to join him in executing a Written Action "to wind-up the business of the Bank ... consistent with the President's revised Budgets for Fiscal Years 1981 and 1982." Congress had not completed action on the President's March 17, 1981 rescission message when the 45-day period expired. However, on June 5, 1981 Congress enacted a supplemental appropria-

tions and rescission act which, *inter alia*, rescinded $121 million of the Bank's FY 1981 appropriation. The Senate Report accompanying the rescission bill explained that the rescission would leave the Bank with an appropriation of only "$250,000 to be used for necessary administrative expenses *to terminate the bank's activities.*" (emphasis added); the report expressed its view that "current market factors and existing tax credits provide ample incentive for conservation and solar improvements." At the same time, Congress abolished the special reserve fund from which the Bank's previous appropriation was to have been drawn.

With no funding for FY 1981 except for money specifically designated by Congress for the termination of the Bank, the Bank's activities essentially came to a halt. The drafting of regulations was discontinued; no Advisory Committee meetings were held; the staff was disbanded.

The Bank's prospects revived, to a limited degree, when on August 13, 1981, Congress enacted the Omnibus Budget Reconciliation Act of 1981, which authorized future Bank appropriations to a maximum of $50 million for each of FY 1982, FY 1983 and FY 1984. The Act's original authorizations had been almost $3 billion for those three fiscal years. Of course, the only actually appropriated funds the Bank had in hand at that time was the $250,000 described by Congress as the administrative costs necessary to terminate the Bank entirely.

On September 11, 1981, Congressional conferees reported an agreement to appropriate $25 million for the Bank. This figure represented a compromise between the Senate's proposal to appropriate no money to the Bank and that of the House to appropriate $50 million. The conference report stated:

> "The conferees direct the Secretary of HUD to expedite all Bank implementation activities by moving rapidly to publish regulations, secure an agent, staff the Bank, and disburse loans and subsidies at the earliest possible date." Conference Report No. 97–222, 97th Cong., 1st Sess., at 7.

No funds under this compromise were actually appropriated at the time of the conference report, because the executive and legislative branches were at loggerheads over the budget as a whole.

On October 1, 1981 Congress enacted a Continuing Resolution which provided an interim appropriation of $3.5 million to be available for the Bank's use until the enactment of regular appropriations for FY 1982. That appropriation triggered further action by the President under the Impoundment Control Act. On October 29 he submitted a special message to Congress, pursuant to the Impoundment Control Act, proposing that the Bank's appropriation be withheld for the duration of the Continuing Resolution. It appears that neither House of Congress overrode the deferral.

However, on December 23, 1981 Congress enacted the FY 1982 appropriations for HUD. They included $25 million for the Bank, as agreed in the September conference compromise. The appropriating act specified that the funds would remain available until the end of FY 1983. In the month that followed, the Office of Management and Budget reduced the Bank appropriation to $21.85 million as permitted by provisions in the appropriating act.

It appears that the Executive took no further actions with regard to the Bank until February 8, 1982, when President Reagan again invoked the Impoundment Control Act and sent Congress a special message proposing the rescission of the entire FY 1982 Bank appropriation. On April 26, 1982, the 45 legislative days had passed without Congress' approving the proposal, so that under that statute, no rescission was effected. A few days prior to the expiration of the 45-day period, the Bank began implementation activities, which are currently in progress.

### III.

As the foregoing narrative reflects, when plaintiffs filed their action on April 8, 1982 the executive branch of government was

doing nothing to implement the Act or ready the Bank for operation. In these circumstances, plaintiffs prayed in their complaint for judgment declaring that the defendants were violating the Act and its appropriating statute by not issuing regulations, by not convening the advisory committees, by not staffing the Bank, by not issuing the required annual reports, and by not disbursing funds of the Bank. In addition, plaintiffs prayed for a preliminary and permanent injunction enjoining defendants "from refusing" to promulgate final regulations for the Bank; to convene the advisory committees and permit them to function; to appoint a President, Vice Presidents and subordinate staff of the Bank; to "make operational the Bank and disburse its $21.85 million of appropriated funds during FY 1982 through eligible lenders"; to issue the 1981 annual report to the Congress; and to perform other obligations imposed on them by law. Plaintiffs' motion for a preliminary injunction, filed on May 18, 1982, seeks an order requiring the Bank to take the specified preliminary steps within a period of thirty days, and to require that "at least 80 percent of the appropriation devoted to energy conservation and/or at least 70 percent of the appropriation devoted to solar energy . . . be made available to recipients before September 30, 1982." September 30, 1982 is the last day of FY 1982.

As counsel for plaintiffs recognized at oral argument, the papers filed in response to their motion for preliminary injunction reveal a substantial change in circumstances from the time the complaint was filed. That is to say, the posture of the executive branch is no longer one of inaction in respect of the Bank. The funds covered by the FY 1982 appropriation have now been released by OMB to HUD. A relatively small staff has been recruited to serve the Bank from other departments in HUD. An acting executive director has been appointed. A search for a chief operating officer was instituted; the first three individuals offered the job turned it down, but that office has now been filled, and on the day before oral argument on June 16 the individual appointed, Dr. Richard H. Francis,

took office. Dr. Francis is presently being briefed by the "ad hoc" staff, and, according to the representation of government counsel, should be able within two or three weeks to make recommendations to the Board with respect to "the direction which he wants to take." Transcript of Oral Argument at 61–62. It should be noted, in this regard, that Dr. Francis is not the "President of the Bank" who must be appointed by President Reagan and confirmed by the Senate; he is, rather, the senior staff member.

Notwithstanding these altered circumstances, plaintiffs continue to press for preliminary injunctive relief. Their basic points are these: congressional intent, as manifested by the Act and the appropriations legislation, requires that the designated percentages of the appropriations devoted to energy conservation and solar energy be made available for disbursement during FY 1982; and the defendants' past record of allegedly inexcusable failure to implement the Bank in accordance with the requirements of the Act requires the intervention of a court of equity, at this time, to lay down a timetable for compliance.

The defendants' position, in essence, is that the statutes do not require making any funds available to recipients by the end of FY 1982; that the earlier failures to implement the provisions of the Act in respect of the Bank are entirely understandable in the circumstances, and do not smack of bad faith; and that plaintiffs are not entitled to injunctive relief, at least at this time.

## IV.

As noted, the case is before the Court on plaintiffs' motion for a preliminary injunction. The Second Circuit, in considering motions for preliminary injunctions addressed to the actions of governmental authority, has applied principles made familiar by cases between private litigants. Thus in *State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750 (2d Cir. 1977), the Court stated generally:

"To obtain the preliminary relief he seeks the movant must make ' "a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." ' *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976) (emphasis in original), quoting *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973); *see Pride v. Community School Board*, 482 F.2d 257, 264 (2d Cir. 1973). Further, it should be emphasized that such preliminary injunctive relief can be awarded only upon a *clear* showing that the movant is entitled to the relief, *Triebwasser & Katz v. American Telephone & Telegraph Co., supra* at 1358; *Sonesta International Hotels Corp. v. Wellington Associates, supra* at 250, and that in making such a showing the movant bears a heavy burden, *Pride v. Community School Board, supra* at 264. Moreover, though not evident on its face, the 'language of the second prong of the *Sonesta* test does not eliminate the basic obligation of the plaintiff to make a clear showing of the threat of irreparable harm. That is a fundamental and traditional requirement of *all* preliminary injunctive relief.... In sum, the balancing of hardships test of *Sonesta* necessarily includes the showing of irreparable harm.' *Triebwasser & Katz v. American Telephone & Telegraph Co., supra* at 1359 (emphasis supplied)."

At the threshold, defendants challenge the standing of the plaintiffs to bring this action, and question their showing of possible irreparable harm. There is a considerable number of plaintiffs. They fall within one of several groups: individual consumers of energy conservation or solar energy devices who hope to participate in and benefit from the Bank's funding abilities; financial institutions and providers of services who might participate in activities funded by the Bank; membership organizations in which such individuals, of one kind or another, belong; members of Congress, who served on the committees concerned with the legislation, and purport to speak for their constituents; individual members of the Bank's advisory committees; and entities such as the Cities of Philadelphia and St. Paul and the State of New York, who assert claims in the nature of *parens patriae* on behalf of their citizens.

■ Much could perhaps be written on the issue of standing in respect of each of these groupings of plaintiffs. I do not do so because the fast-approaching end of FY 1982 necessitates a decision on the district court level as quickly as possible. Suffice it to say that this array of plaintiffs includes representatives of every interest conceivably concerned with the implementation of the Act and the operation of the Bank. I am satisfied, without analyzing the question in detail in this expedited opinion, that someone in the plaintiffs' ranks has the requisite standing. Assuming *arguendo* that all plaintiffs' allegations are true— that the executive branch of government is engaging in a bad faith effort to frustrate the legislative purpose—defendants' argument on standing, carried to its logical conclusion, would prevent anyone in the Republic from complaining about it. I cannot accept that view.

■ With respect to the necessary showing on a motion for preliminary injunction, somewhat similar considerations apply. It is true that, on either prong of the *Sonesta* test, a plaintiff must "make a clear showing of the threat of irreparable harm." It is equally true, as defendants point out, that certain of the named plaintiffs make no such showing. For example, the plaintiff financial institution that wishes to participate in the program does not demonstrate that it will close its doors if it cannot do so; and the plaintiff purveyor of solar energy equipment does not demonstrate that impending bankruptcy would be prevented if the Bank made funds available for distribution to consumers on or before September 30, 1982. But certain of the plaintiffs are

potential individual consumers of energy conservation or solar heating devices. They submit affidavits that they, and family members, suffer from the winter's cold; that they desire to insulate or otherwise heat their homes; and that, in view of their straitened financial circumstances, the Bank and its programs constitute their only possible source of funding and, hence, relief.

To this the defendants respond that even these individuals demonstrate no more than a hope of participation in Bank funding, and a remote hope at that, given the drastically reduced amount of appropriated funds and the large number of potential nationwide applicants. Defendants argue that since no applicant can demonstrate that he or she would definitely participate in the program, no one can demonstrate the requisite possibility of irreparable harm. Of course, it is true that no one can demonstrate a present, absolute right to participate in the program; that necessarily follows from the fact that the defendants have, until very recently, done nothing to implement it. But a court of equity should not blind itself to the practical realities of the case. Again, taking their argument to its logical conclusion, defendants could wrongfully and wilfully refuse to implement a congressionally mandated program, and then, precisely because they have done so, contend that since no one can be positively identified as a participant in the program, it is impossible for anyone to demonstrate the requisite possibility of harm, thereby rendering the Chancellor entirely powerless. I do not find that argument appealing. I conclude that, at least with respect to the individual consumer plaintiffs, they have in the circumstances of the case demonstrated a sufficient degree of possible irreparable harm to permit an appeal to the Court's equity power.

I turn, then, to plaintiffs' probable success on the merits (first prong of the *Sonesta* test), or the seriousness of the questions and the direction in which the balance of hardship tips (second prong). Under either test, a key question is whether or not the Act and its accompanying appropriation for FY 1982 mandate that the Bank make funds available for distribution before the end of the fiscal year. On this issue, the parties are squarely divided.

█ In my judgment, there is a substantial likelihood that the plaintiffs will prevail on this issue. In § 3620(a), the Act authorizes appropriations for financial assistance for the purchase and installation of energy conserving improvements. Section 3615(b) authorizes appropriations for financial assistance for the purchase and installation of solar energy systems. In § 3614(a), the Congress specified that "[a]n amount equal to not less than 80 percent of the funds appropriated" under § 3620(a) *"shall be provided during such fiscal year* for financial assistance ... for the purchase and installation of residential energy conserving improvements in residential and multifamily residential buildings." (emphasis added). A comparable provision appears in § 3615(b), relevant to funds appropriated under § 3620(b), although the controlling percentage is 70 percent rather than 80 percent. The congressional mandate, appearing in each section, that the designated amount "shall be provided during such fiscal year" seems clear enough. It is that the agency is required to "provide," that is to say, to make available for distribution to qualified applicants, the designated percentages of appropriated funds "during such fiscal year." If there were any lingering doubt about this construction, it would appear to be resolved by the sub-caption with which Congress prefaced each of §§ 3614(a) and 3615(b):

> *"Minimum fiscal year expenditures* for residential and multifamily residential building improvements." (emphasis added).

Defendants argue strenuously that Congress could not have intended that a particular amount actually be expended during a particular fiscal year. That is so, defendants say, because there can be no certainty that a sufficient number of qualified applicants would appear to exhaust the appropriated funds made available for that year. That argument sets up a straw man for the

purpose of knocking it down. Cf. *Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975), in which the Court construed the Federal Water Pollution Control Act Amendments of 1972. Section 205(a) of that Act provided that the "[s]ums authorized to be appropriated pursuant to [§ 207] . . . shall be allotted by the Administrator." Section 207 authorized the appropriation of "not to exceed" specified amounts for each of three fiscal years. The Administrator, obedient to a presidential direction, refused to allot to the City of New York the full amount authorized by § 207 for FY 1973 and FY 1974. The Court held in *Train* that the act did not permit the Administrator to allot to the states under § 205(a) less than the entire amounts authorized to be appropriated by § 207. In reaching that conclusion, the Court also observed:

"If the States failed to submit projects sufficient to require obligation, and hence the appropriation, of the entire amounts authorized, or if the Administrator, exercising whatever authority the Act might have given him to deny grants, refused to obligate these total amounts, § 207 would obviously permit appropriation of the lesser amounts." *Id.* at 43, 95 S.Ct. at 844.

So, too, in the case at bar. Although seemingly unlikely, it is possible that an insufficient number of qualified applicants would present themselves to exhaust the reduced funds appropriated for FY 1982. But that hypothetical possibility simply does not address the question of whether the responsible officers in the executive branch are required to provide, in the sense of making available, the appropriated funds during the fiscal year for the benefit of such applicants who may be eligible.

Defendants argue that the quoted provisions of §§ 3614(a) and 3615(b) "were simply designed to allocate specified percentages of available funds exclusively for residential use," without indicating a congressional intent "that a specified percentage of funds be expended in any particular fiscal year." Defendants' brief at 16–17. This argument appears contrary to the plain wording of the statute. Defendants also purport to find, in the direction of the September 11, 1981 congressional conference report that the Secretary of HUD "expedite all Bank implementation activities" and "disburse loans and subsidies at the earliest possible date," an implicit repeal of whatever timing requirements were included in the original Act. I find difficulty with this argument, since it appears to translate "hurry up" into "take your time." Congressman Bill Green of New York, one of the plaintiffs in the action and the ranking Republican member of the House Appropriations Subcommittee on HUD Independent Agencies, has submitted a supplemental declaration in support of the motion, which states that the quoted language was intended to reflect the Committee's intention "that implementation of this legislation by HUD proceed forthwith, as specifically provided in sections 516 [12 U.S.C. § 3614] and 517 [12 U.S.C. § 3615] of the statute, through the appropriation in the bill." In my view, that expression of legislative intent militates in favor of the plaintiffs' construction of the statute, and against that of the defendants.

■ For the foregoing reasons, I conclude that the plaintiffs have demonstrated a likelihood of success on the underlying issue of congressional intent. But there is another key question underlying the granting or withholding of injunctive relief at this time; and that is whether, on the present record, this Court should impose specific timetables upon the executive branch for implementation of the various specific requirements of the Act.

The most significant of these implementing steps is the promulgation of regulations. Everyone agrees that funds cannot "be provided . . . for fiscal assistance" for the purchase and installation of energy conserving improvements or solar energy systems until detailed regulations are in place. Plaintiffs ask for an order directing the Bank Board and staff to promulgate such regulations in sufficient time to make funds available for disbursement not later than September 30,

1982. The defendants respond that the substantially scaled-down scope of the program necessarily requires reevaluation of its goals and priorities; and, toward that end, the interim regulations drafted by the Carter Administration appointees in December of 1980 must be reconsidered and redrafted. Defendants articulate the choice as lying between an unreasonable timetable imposed by the Court, which would deprive the responsible agency of an opportunity for needed reevaluation, and a timetable worked out by the agency itself which, while requiring more time to accomplish and set in motion, will permit that careful consideration which altered circumstances require.

There is considerable force in defendants' contention. Recognizing that the amounts of original legislative authorizations are frequently not fully appropriated, the fact remains that when the original Bank staff drafted the December, 1980 interim regulations, they were contemplating an FY 1981 appropriation of $122.5 million. That is established by the supplemental declaration of Ms. Naismith, an original Carter Administration Bank appointee, submitted in support of the motion. In point of fact, the amount actually appropriated for FY 1982, the first year of possible implementation of the program, is only $21.85 million. That is a significant reduction; and I find entirely plausible the defendants' argument that far-reaching reconsideration of the program's goals, and in consequence its implementing regulations, is necessary. For example, it may be necessary to shift the previous emphasis upon first-come, first-served nationwide applications to a system which allocates expenditure of these limited resources on the basis of differing regional needs (the distinction lying between the colder climates of the northern states and the more temperate conditions prevailing in the "Sun Belt" states).

Plaintiffs insist that if the Court declines to impose a timetable for compliance upon the defendants, the Court will in effect be sanctioning an unauthorized deferral or rescission of appropriated funds. The issue is not that simple. The executive branch of government may or may not defer the expenditure of appropriated funds, or seek to rescind the appropriation altogether; its right to do so will depend upon the proper construction of the pertinent statutes, the Impoundment Control Act being the most recent effort of Congress to legislate in this sensitive area. The responsibilities of a court of equity are at once more broad and less rigidly defined. That is to say, the court may perceive an obligation on the part of the executive branch to act within a certain time, in furtherance of the will of the legislature, and yet also conclude that enforced compliance with that timetable should not, in the circumstances of the case, be mandated. *See, e.g., Natural Resources Defense Council v. Train,* 510 F.2d 692 (D.C. Cir.1975), and *Kennedy v. Mathews,* 413 F.Supp. 1240 (D.C.1976). In *National Resources Defense Council,* the Court of Appeals stated generally at 712–13:

"The courts cannot responsibly mandate flat guideline deadlines when the Administrator demonstrates that additional time is necessary to insure that the guidelines are rooted in an understanding of the relative merits of available control technologies. . . .

\*     \*     \*     \*     \*     \*

"A federal equity court may exercise its discretion to give or withhold its mandate in furtherance of the public interest, including specifically the interest in effectuating the congressional objective incorporated in regulatory legislation. We think the court may forebear the issuance of an order in those cases where it is convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities. The sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him 'to do an impossibility.'" (footnotes omitted).

In *Kennedy, supra,* the court held that although the statute in question (a federally sponsored nutrition program for the elder-

ly) required expenditure of appropriated funds within a particular fiscal year, the fact that only one and one-half months remained until the end of that fiscal year justified an order directing expenditure of the funds during the following fiscal year.

In the case at bar, the HUD officials responsible for the Bank now profess their intention to implement its programs as quickly as the circumstances permit. Plaintiffs are openly skeptical of defendants' declared intentions, in the light of what plaintiffs perceive to be defendants' bad faith failures at implementation in the past. Whether defendants' prior conduct should be so characterized depends, in large part, upon whether the President was entitled to invoke the deferral and rescission provisions of the Impoundment Control Act in respect of the provisions of the Solar Energy and Energy Conservation Bank Act; and whether the Bank officers were justified in deferring implementation during the pendency of the deferral and rescission applications. Because no deferral or rescission message is presently pending under the Impoundment Control Act, I need not and do not decide whether that statute may validly apply to the Act here in question.[3] It must, in any event, be recognized that the officials at HUD could have done more than

they did to lay the groundwork for implementation of the Act, on the assumption that rescission efforts might fail.[4] But I am not prepared to assume, at least on the basis of the present record, that those HUD officials recently come to their Bank responsibilities will not act in good faith in attempting to discharge them. The motto inscribed on the front of the National Archives in Washington reads: "What Is Past Is Prologue." What has occurred in the past, in the affairs of the Bank, is prologue to what will now occur. Plaintiffs have not yet demonstrated that those occurrences must take place in accordance with a court-mandated time schedule, rather than permitting exercise of the discretion and expertise of the agency charged with administering the program. This is so, even though failing to impose at this time the timetable prayed for by the plaintiffs will inevitably result in the funds being made available after the end of FY 1982. There is, of course, no risk that as a result the funds will revert to the treasury and be lost for their intended purpose; the statutes specifically provide that FY 1982 appropriated funds not expended in that year will be carried forward and be available in the next fiscal year.[5]

**3.** Given my conclusion that the Act mandates the making available of funds during FY 1982, there is authority for the proposition that the Impoundment Control Act cannot operate to affect that result. Cf. *State of Maine v. Goldschmidt*, 494 F.Supp. 93 (D.Me.1980), in which Judge Gignoux construed the interplay between the Impoundment Control Act and the Federal-Aid Highway Act of 1956. The Highway Act had previously been construed, without regard to the Impoundment Control Act, as preventing the President from deferring authority to obligate highway funds previously apportioned to the states, for reasons related to the status of the economy and the need to control inflationary pressures. *State Highway Commission v. Volpe*, 479 F.2d 1099 (8th Cir. 1973). In *Goldschmidt*, where the executive branch urged the Impoundment Control Act as an independent basis for deferring highway funds, Judge Gignoux held that the fourth disclaimer in the Impoundment Control Act, 31 U.S.C. § 1400(4) "precludes the application of that Act to the Highway Act," so that the executive "does not have the legal authority to reduce the obligational limit for the current fiscal year

established by Congress under the Highway Act." 494 F.Supp. at 100. The office of the Comptroller General of the United States appears to have reached the same conclusion with respect to funds appropriated for the solar energy and energy conservation Bank under the statute at bar. Opinion No. B–205053, dated March 10, 1982, at 26.

**4.** Plaintiffs indicate the examples of the Wind Energy Systems Act and the Residential Energy Efficiency Program, programs for which the Executive issued regulations despite an expressed intention to prevent funding, if possible, by resort to rescission. (45 Fed.Reg. 6776; 47 Fed.Reg. 19980; Plaintiffs' Reply Brief at 8).

**5.** 12 U.S.C. § 3620(c) provides that "[any] funds appropriated under the authorizations contained in this section shall remain available until expended." In enacting the FY 1982 appropriation for the Bank, Congress specified that the funding is "to remain available until September 30, 1983." Pub.L.97–101, 95 Stat. 1417.

I conclude, in the circumstances of this case, that I should not direct the defendants to promulgate regulations by a specific date, or require them to make Bank funds available for distribution by September 30, 1982. Nor will I enjoin compliance with other specific statutory duties by a given date. For example, it would not be sensible to order the defendants, under the pain of contempt, to have a President of the Bank nominated by the defendant Reagan and confirmed by the Senate within, say, thirty days. It may not be possible to find a qualified individual willing to serve within that period of time. As noted, several individuals offered the position of chief operating officer of the Bank turned the job down. When one considers the salaries that are available in the private sector, as opposed to all branches of government—executive, legislative, and judicial—this is hardly surprising. As for the annual reports, defendants' motion papers state that the first annual report will be filed by the end of this month. Use of the advisory committees, in identifying goals and priorities, is also promised by the defendants' motion papers.

For the foregoing reasons, I deny the preliminary injunction sought by the plaintiffs. It is my judgment, however, that plaintiffs are entitled to an order at this time which will place the defendants responsible for the implementation of the Bank under a court-supervised obligation to implement the Act and make the appropriated funds available for expenditure to qualified applicants as expeditiously as the good faith efforts of those defendants may permit. Such an order will be consistent with the Court's holding that, contrary to defendants' contention, Congress intended that the FY 1982 appropriation be made available for distribution within that year. The Court's order will also require a status report from defendant Pierce, the Secretary of HUD and Chairperson of the Bank's Board. Finally, the order will dismiss the complaint against defendant Stockman, Director of OMB, as moot. That is because, since the filing of the complaint, OMB has released the appropriated funds to HUD.

CONCLUSION

For the foregoing reasons, it is hereby

ORDERED, that the complaint against defendant David A. Stockman be, and the same hereby is, dismissed as moot; and it is further

ORDERED, that defendants Reagan, Pierce, Edwards, Regan, Block, Baldridge, and the Department of Housing and Urban Development be, and the same hereby are, directed to expedite all Bank implementation activities, and to make those funds appropriated for Bank use for FY 1982 available for disbursement to qualified applicants, as quickly as good faith discharge of the said defendants' responsibilities under the Act will permit; and it is further

ORDERED, that defendant Pierce or his designated representative file and personally serve upon the attorneys for plaintiffs, not later than August 30, 1982, an affidavit stating in detail the steps taken to implement the Bank and its programs as of that date, together with an estimate of the date upon which funds appropriated to be provided during FY 1982 will in fact be available for distribution to qualified applicants; and it is further

ORDERED, that counsel for the parties attend a hearing at 10:00 a. m. on Thursday, September 2, 1982, in Courtroom 312, to consider the present status of the case.