**STATE OF TENNESSEE ex rel., William M. LEECH, Jr., Attorney General and Reporter**

v.

**Elizabeth H. DOLE in her official capacity as Secretary, United States Department of Transportation; R.A. Barnhart, in his official capacity as Administrator, Federal Highway Administration, United States Department of Transportation; and E.G. Oakley, Division Administrator, Federal Highway Administration, United States Department of Transportation.**

No. 3–83–0046.

United States District Court, M.D. Tennessee, Nashville Division.

May 18, 1983.

William J. Haynes, Jr., Deputy Atty. Gen.
State of Tenn., William M. Leech, Atty.

Gen. State of Tenn., Nashville, Tenn., for plaintiff.

James C. Thomason, Jr. Asst. U.S. Atty., U.S. Govt., Joe B. Brown, U.S. Atty. for U.S. Government, Nashville, Tenn., for defendants.

## MEMORANDUM

JOHN T. NIXON, District Judge.

The State of Tennessee through its Attorney General and Reporter, William M. Leech, Jr., filed this action on January 13, 1983 against the Secretary of the United States Department of Transportation, Elizabeth H. Dole, (the Secretary) and the Administrator and Division Administrator of the Federal Highway Administration, R.A. Barnhart and E.G. Oakley, respectively, seeking a declaratory judgment and injunctive relief. At issue is whether the defendants have any Congressional or Constitutional authority to withhold or debit any amount of monies against the State's account with the Federal Highway Administration (FHWA) because of the State's recovery of overcharges due to bid-rigging on Tennessee highway construction projects awarded under the Federal-Aid Highway Act of 1956, as amended, 23 U.S.C. §§ 101, et seq. (the Highway Act). This Court has jurisdiction by virtue of 28 U.S.C. § 1331(a), this case arising under Article I, Section 8 of the United States Constitution and the Highway Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1361 because the State seeks to compel the Secretary and her agents to properly perform their duties under federal law. Venue lies in this District under 28 U.S.C. § 1391(e).

By agreement of the parties, the trial on the merits of this action was consolidated with the State's motion for preliminary injunctive relief and a hearing was held on April 28, 1983. Fed.R.Civ.P. 65(a)(2). The Secretary further agreed to withhold taking any action on the State's billings under the Highway Act pending this Court's decision. The parties submitted the case to the Court based on the pleadings and documentary evidence, objecting only to relevance of certain documents. Pursuant to Fed.R.Civ.P. 52(a), this Memorandum contains the Court's findings of fact and conclusions of law.

## I.

The parties do not dispute that in 1979, the United States Department of Justice and a federal grand jury commenced an investigation of possible bid-rigging on highway construction projects let for competitive bidding by the State under the Highway Act. This investigation included companies and persons in Tennessee. As a result of the investigation, criminal proceedings were initiated against numerous firms and persons identified as involved in collusive bidding on highway construction projects let by Tennessee under the Highway Act. More than seventy firms and individuals were convicted of bid-rigging in violation of either the Sherman Antitrust Act, 15 U.S.C. § 1 et seq., or the federal mail fraud statute, 18 U.S.C. § 1341 et seq. Most of these convictions in Tennessee were obtained by guilty plea agreements between the United States and the defendants named in the criminal actions. The federal guilty pleas usually included a pledge by the convicted firms and persons to cooperate with the United States in its on-going investigation of bid-rigging on highway construction projects. *See e.g.,* Information, Petition to Enter Guilty Plea and Guilty Plea Agreement in *United States v. Burns & Baker & J.H. Burns,* No. 80–30142 (M.D.Tenn.1980), State's Exh. B. Upon conviction in federal court the FHWA Administrator debarred or disqualified the convicted firm for a period of time from employment on federally funded FHWA projects. State's Exh. D and Secretary's Exh. 7. If a convicted firm agreed to cooperate with federal authorities the FHWA Administrator, in several instances, reduced the firm's debarment period thereby acknowledging the firm's cooperation. *Id.* State's Exh. D and Secretary's Exh. 7.

It is uncontroverted, and the documentary evidence establishes, that the State's civil investigation resulted in certain settlement agreements.[1] These settlement agreements involved disputed claims of injuries suffered by the State because of collusive bidding in violation of the Federal and State Antitrust Laws. 15 U.S.C. §§ 1 and 15; Tenn.Code Ann. §§ 69–101, *et seq.* The settlement agreements expressly stated that the settlement represented a compromise and release only of the claims of the State. State's Exh. E.

During the course of the State's investigation, Sanford M. Litvack, Assistant Attorney General, United States Department of Justice, Antitrust Division, from January 1980 to March 1981, advised General Leech as to the Department's legal position on claims for recovery of overcharges due to bid-rigging on highway construction projects under the Highway Act. In his undisputed affidavit, Mr. Litvack states that he supervised the Antitrust Division's litigation involving bid-rigging and prosecutions in Tennessee and that in 1980 the Division's position was "that only the State was injured in its property by reason of bid-rigging on such highway construction projects and that the United States had no legal claim or interest in such recoveries under the federal antitrust laws". He further stated, "The Division's legal position had been previously stated in litigation in Illinois involving suits to recover overcharges due to bid-rigging on highway construction projects awarded by the State of Illinois under the [Highway Act]. Those cases were *State of Illinois v. Brighton Construction Co., et al,* and *United States v. Azzarelli Construction Co., et al.*" Litvack Affidavit, Exh. G. Mr. Litvack's assertion on September 10, 1980 to General Leech that the United States had no interest in Tennessee's efforts to recover any overcharges due to bid-rigging on highway construction

projects under the Highway Act is supported in the briefs of the United States in the *Brighton* and *Azzarelli* cases.

*Brighton* involved an action brought by Illinois to recover damages under the Clayton Act, 15 U.S.C. § 15, against highway contractors who conspired to rig bids on highway construction projects. The defendants in *Brighton* moved to join the United States as an indispensable party under Fed.R.Civ.P. 19. When the district court granted the motion, the State of Illinois moved to reconsider and the United States filed a brief supporting Illinois' motion to reconsider. State's Exh. H. In that brief, the United States argued that only the State of Illinois was entitled to overcharges due to bid-rigging on projects let under the Highway Act.

"The United States agrees with the State of Illinois that the United States is not a necessary party to this proceeding. In the case of the highway construction program at issue here, the State of Illinois may maintain an action for the entire injury flowing from the alleged antitrust violation pursuant to Section 4 of the Clayton Act. While federal funds financed the highway project at issue, those funds were drawn from a fixed allotment to the State of Illinois set aside for that state's use in highway construction. Accordingly, in a federal funding program of this type, the state ultimately feels the effects of the overcharge by losing opportunities that it would have enjoyed but for the illegal overcharge. Allowing the state to sue under the Clayton Act for the entire overcharge, is supported not only by logic based on the particular state relations involved in the Federal Aid Highway Program but also by important policy considerations. Effective incentive to state antitrust enforcement and the deterrent value of the antitrust laws are served by deeming the

---

1. The Secretary admits that the State requested information relative to bid-rigging on State highway construction projects, during the course of the State's investigation. However,

disclosure of this information was restricted due to the pendency of federal grand jury proceedings and Fed.R.Civ.P. 6(e).

state injured to the full extent of the overcharge for the Clayton Act remedy purposes in this case."

* * * * * *

"The issue here is whether for these purposes, the Federal Aid Highway Program more closely resembles a revenue sharing program or an unlimited payment program such as Medicaid. It is our position that the Federal Aid Highway Program bears a closer resemblance to revenue sharing than to Medicaid and accordingly the State of Illinois should be deemed injured to the full extent of overcharges for the purpose of the Clayton Act and should be permitted to recover the entire amount, treble."

* * * * * *

"When the cost of an approved project is inflated as a result of bid rigging, the state suffers the full effect of such inflation. The amount of federal funds available to it that year remains the same, but the amount of highway the state can purchase with those funds is reduced by the illegal overcharge. The state is forced to use up some of its federal road construction funds to pay the overcharges. This may cause it to trim its highway program accordingly or else use state funds. The state feels the pinch for the state's plans and projects are affected by the amount which the bidriggers have obtained as a result of their collusion."

State's Exh. H at 4–5, 8 and 10–11; MEMORANDUM OF THE UNITED STATES IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION at 5–5, 8 and 11, *Illinois v. Brighton Building & Maintenance Co., et al,* No. 77–C–4541 (N.D.Ill.).

Similarly, in the *Azzarelli* case, which was brought by the United States against several firms for bid-rigging, the United States maintained in its brief that

[B]y the terms of the Federal Aid Highway program, a limited amount of federal funds is apportioned to each state each fiscal year. The state plans the highway projects it will undertake in light of this overall budgetary constraint. If the cost of one project is higher than expected due to bid rigging, this reduces the amount of funds available to the state for other projects that year. The state will be able to purchase less highway with the amount of money available to it. The federal government would pay more than was necessary on the one project as a result of bid rigging, but it would not be damaged overall since the amount of overcharge would be off set by the corresponding reduction in the amount of federal funds available for other state projects that year.

State's Exh. I at 5; GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE MOTIONS OF THE DEFENDANTS AND THE STATE OF ILLINOIS TO DISMISS THE COMPLAINT at 5, in *United States v. Azzarelli Construction Co.,* No. 79–3178 (C.D.Ill.). Thus, it appears that Mr. Litvack's representation to General Leech that the State alone was the proper party to recover any overcharges due to bid-rigging under the Highway Act was an accurate statement of the United States' position.

Because of the State's recovery of overcharges from firms engaged in bid-rigging on Tennessee highway construction projects, the defendant Oakley, on June 12, 1981, requested certain information so that the federal share of the sums recovered could be credited to the projects on which the alleged overcharges occurred. Oakley explained that this action would prevent the State from recovering twice for the overcharges; once under the Highway Act and again from the bid-riggers. State's Exh. F—Attachment A; Secretary's Exhibit 1. In a letter dated August 3, 1981, General Leech responded to Oakley's request for information stating that he could discern no legal basis for FHWA's claim for recovery of funds under the State's settlement agreements and citing *United States v. Azzarelli Construction Co.,* 647 F.2d 757

(7th Cir.1981). Accordingly, General Leech denied Oakley's request for the settlement information.

Again, in a letter dated November 23, 1981 Oakley wrote the Tennessee Commissioner of Transportation requesting information needed to determine the federal pro rata share of settlement funds obtained by the State from the bidriggers. State's Exh. F—Attachment B; Secretary's Exh. 2. General Leech responded by letter to Oakley's letter of November 23, 1981 on January 14, 1982, again denying Oakley's request for information based on the *Azzarelli* case.

Through yet another letter dated December 6, 1982 Oakley requested certain information from the State. Oakley advised the Commissioner of the Tennessee Department of Transportation that if Tennessee failed to cooperate in thirty (30) days, then FHWA would unilaterally recover its pro rata share of the settlement amounts. Oakley explained in this letter that:

> Pursuant to current FHWA policy when a State fails or refuses to comply with the terms of its project agreements and FHWA regulations by refusing to credit Federal-aid projects for the appropriate pro rata share of funds recovered, the FHWA Division Administrator is required to make a reasonable effort to identify the projects involved and unilaterally reduce the Federal-aid participation in all such projects by an amount sufficient to cover any possible restitution or refunds the State obtains, by deduction from unpaid vouchers.

> Consequently, if the requested information is not provided within the thirty days, the Federal Highway Administration will be required to act unilaterally in deducting the appropriate funds from the current billing voucher. The Department's unobligated balances for the class of funds involved would then be adjusted to reflect the deductions made by these procedures. Conversely, should the Attorney General's Office agree to credit

the appropriate Federal-aid projects the Federal share of the funds obtained from the negotiated bid-rigging settlements, such action would result in the credits being applied to TDOT's unobligated balance of Federal-aid highway funds and the funds would not be returned to the Federal Treasury.

State's Exh. F—Attachment C; Secretary's Exhibit 3. The rationale offered by Oakley for taking this action was that:

> Federal-aid highway funds can only be used to reimburse a State Highway Agency for properly attributable costs of construction actually incurred on a Federal-aid project. When funds are recovered from a contractor for restitution and compensatory damages, it is clear that the State's actual costs attributable to the Federal-aid project or projects covered by the agreement have been reduced; thus, a credit must be made to the project based on actual final costs. It is FHWA's position that credits to the appropriate Federal-aid projects are due on those Federal-aid projects which have been involved in restitution agreements and that detailed information concerning the computation of restitution and compensatory damages on these projects must be provided to FHWA upon request.

At the hearing, the Secretary clarified Oakley's December 6th letter explaining that when FHWA made deductions from Tennessee's current billings that amount would be made available to Tennessee for other highways. Thus, Tennessee would not "lose any money, there is no harm". Transcript of Proceedings, April 28, 1983 at 15 and 20.

On April 8, 1983, the Tennessee Commissioner of the Department of Transportation received another letter from Oakley dated April 6, 1983. In this letter Oakley stated that FHWA had unilaterally determined that the federal pro rata share of the State's settlement fund was $4,500,290.00 and that this amount would be deducted from the State's next billings under the Highway Act. Oakley further explained

that the sums subtracted could be restored to the unobligated balance of the Department's federal account by appropriate fiscal action. If the fiscal transactions were completed, the funds could be reobligated on future federal-aid at the Department's discretion and subject to available obligational authority, State's Exh. F—Attachment 14.

The State contends in this lawsuit that the defendants attempt to recover a share of the State's recoveries of overcharges from the bid-riggers is without any legal or Congressional authorization. Specifically, the State maintains that FHWA has no legally protectable interest in the State's antitrust recoveries because (1) the settlement agreements relate only to overcharges suffered by the State and (2) the funds appropriated to FHWA are gifts; thus, the defendant suffered no monetary loss due to the bid-riggers only the State. The State strongly contends that neither the Secretary nor FHWA has any Congressional authority to withhold funds due to the State's recoveries from the bid-riggers. Alternatively, the State maintains that the defendants should be estopped from asserting any interest in the State's funds due to prior representations. Other arguments asserted by the State that need not be directly addressed are as follows: (1) the United States itself can pursue recovery of any overcharges owed to FHWA against the offending parties under 15 U.S.C. § 15(a); (2) the information requested by FHWA is subject to privileges against disclosure pursuant to Tenn.Code Ann. § 10–7–504(d)(1), (2), (3); and (3) even if lawful, the defendants' requests to Tennessee are premature as the State's enforcement activity has not yet concluded.

## II.

When Congress enacted the Federal-Aid Highways Act, it found that the national interest would be served by the acceleration of the construction of the federal highway systems to serve local and interstate commerce and to enhance national and civil

defense. 23 U.S.C. § 101(b); *State Highway Commission of Missouri v. Volpe,* 479 F.2d 1099, 1107 (8th Cir.1973). In *State of Maine v. Goldschmidt,* 494 F.Supp. 93, 95–96 (D.Me.1980), Judge Gignoux succinctly explained how the Highway Act operates:

> The Highway Act established a system of grants-in-aid to the States to finance a part of the cost of constructing highways in the Federal-aid highway system. 23 U.S.C. § 103. For Interstate projects, the amount of the federal contribution is, in most cases, 90%; for primary, secondary and urban projects, 75%; and at other rates for other categories of projects. 23 U.S.C. § 120. The Act is administered by the Secretary through the Federal Highway Administration (the FHWA). The Act provides for a complex funding method. Congress authorizes the expenditure of funds for each fiscal year (October 1–September 30) in periodic appropriations acts. *See* note fol. 23 U.S.C. § 101. At the beginning of each fiscal year, the Secretary apportions the annual authorization of funds from Congress among the States in accordance with a formula set forth in 23 U.S.C. § 104(b). Upon apportionment, each State is notified of its share of the national authorization. Once apportioned to a State, the apportioned amount is for its exclusive use, and may be "carried over" for one additional fiscal year (Interstate authorizations) or for three additional fiscal years (non-Interstate authorizations). 23 U.S.C. § 118(b). The apportionment for the current fiscal year, together with its "carry-over" apportionments from prior years, constitute the State's available apportionment at the beginning of the year. The States must follow the statutorily prescribed procedure to receive federal grants. At the beginning of each fiscal year, the State submits for FHWA's approval a program of projects for which federal funds are desired. *Id.* § 105. If FHWA approves the program, the State submits specific projects for approval.

*Id.* § 106(a). FHWA approves those projects meeting the requirements of 23 U.S.C. 106(a). Approval of an individual project creates a contractual obligation of the United States to pay the federal share of the cost of constructing the project. *Id.* Upon project approval, the State is permitted to obligate the apportioned funds by entering into construction contracts. The State then is reimbursed for actual expenditures as it submits vouchers for work completed. The required funds are paid out of liquidating appropriations, provided by annual appropriations acts. Thus, an obligation created in one year normally has actual expenditure impact on the federal budget in ensuing fiscal years.

In addition to its annual authorization for appropriation, Congress sets a limit on the total amount of the apportioned budget authority which may be obligated by the States in each fiscal year. This "obligation of authorized funds nationwide, and this ceiling", rather than the total of the States' unused apportionments, becomes the constraint on the national program.

Although this Court adopts Judge Gignoux's explanation of the Highway Act, several aspects of the Act's funding procedure require special emphasis and are important to the resolution of this case. In this regard, the Court has drawn heavily from a publication of the U.S. DEPARTMENT OF TRANSPORTATION, FINANCING FEDERAL–AID HIGHWAYS (1979). *See also* Figure I Financial Procedures (Contract Authority Programs).

First, the Federal highway program is a reimbursable program; that is, what is apportioned to the States is *not* cash but obligation authority. The States must provide the initial cash to begin a certain highway project but progress payments are permitted. 23 U.S.C. § 110. Ordinarily, after a highway project has been approved the contractor begins work and the State makes payments to the contractor. The State then submits vouchers to FHWA for review and approval. Upon approval of the vouchers, they are transmitted to the United States Treasury Department and, then, the Treasury Department credits to the State's bank account the federal share of a highway project's cost. FINANCING FEDERAL–AID HIGHWAYS, *supra,* at 18–19.

Second, the key step in the Highway Act financing is obligation, which represents the Federal government's commitment to reimburse a State for the federal share of a State's highway construction project. The FHWA administrators—such as the defendants Barnhart and Oakley—have been delegated authority to enter contractual agreements that obligate the United States. Obligation is the key step because obligated funds are considered "expended" even though no cash is transferred. Moreover, when funds are obligated, they cannot lapse. The obligation process is the last step in the financing process that the Federal government can control. *Id.* at 22 and 24.

Third, the availability of funds under the Highway Act is directly related to the available obligation authority. Ordinarily, there are funds remaining—unused parts of previous apportionment—old obligation authority that is combined with new obligation authority, which makes up the total available obligation authority for a State. This situation arises because the availability of Highway Act funds for use does not terminate at the end of a fiscal year. Interstate funds are available for two years, from one year in advance of the fiscal year for which they are apportioned until the end of the fiscal year authorized. 23 U.S.C. § 104(b)(5)(A); 23 U.S.C. § 118(b). Highway Act funds for non-Interstate purposes are available for three years after the close of the fiscal year for which such sums are authorized. 23 U.S.C. § 104(b); 23 U.S.C. § 118(b). Thus, non-Interstate funds are available for four years. A State's failure to obligate its funds within the specified statutory period—two years for Interstate

funds and four years for non-Interstate funds—results in the lapse of its authority to obligate funds. When funds lapse, they are no longer available to the State.[2] Of course, when funds lapse no money is returned by the State, but only obligation authority. An exception to the lapsing provision is when Interstate funds lapse they may be allocated to other States. 23 U.S.C. § 118(b). *See* U.S. DEPARTMENT OF TRANSPORTATION, FINANCING FEDERAL-AID HIGHWAYS at 18–19, 22–27 & 56 (1979).

### III.

The State has properly focused on the central question underlying this lawsuit, that being whether the funds obtained by the State through the Highway Act are State funds or federal funds. If the funds appropriated under the Highway Act are federal funds, then the State recovered Federal funds from the bid-riggers. Conversely, if the Highway Act in fact provides funds to Tennessee that become State funds, then clearly the State recovered its own funds from the bid-riggers. It is the opinion of this Court that by operation of the Highway Act, the funds at issue in this case are State funds.

■ As previously explained, the critical feature of the Highway Act is the obliga-

tion procedure, whereby the federal government commits itself to reimburse a State for a certain percentage of the cost of a highway project. 23 U.S.C. §§ 106(a) and 118. However, even before highway funds are obligated to a specific highway project, when highway funds are apportioned, they are controlled by the State. This conclusion is compelled by the language in 23 U.S.C. § 118, which provides, in part:

> (a) On and after the date that the Secretary has certified to each State highway department the sums apportioned to each Federal-aid system or part thereof pursuant to an authorization under this title, or under prior Acts, such sums shall be available for expenditure under the provisions of this title.

In *State Highway Commission of Missouri v. Volpe,* 479 F.2d 1099, 1110 n. 15 (8th Cir.1973), the Court addressed the issue of whether the States have any vested interest in funds appropriated under the Highway Act before a specific highway project is approved by the Secretary. Although the Court found it unnecessary to address this issue directly, the Court stated that "a reasonable construction of Section 118(a) is contrary to the Secretary's argument that the states have no inchoate interest whatsoever in the funds so apportioned." The *Volpe* Court reasoned that the mandatory language in § 118(a)—"shall be available

**2.** The Secretary has consistently represented to the State and this Court that if the State provided FHWA the information requested the Federal pro rata share of the State's recoveries from the bid-riggers would be credited to Tennessee's unobligated account with FHWA. As explained by the Assistant United States Attorney at the hearing, it is "ironic that the only harm that Tennessee can suffer is if they continue to follow the Attorney General's Department of Transportation's position and refuse to credit back to the Federal Government, the Highway Administration, the Federal share of their recoveries. If they follow what we have suggested that they do, which seems to be provided by the code and by the regs, the four and a half million dollars that Mr. Oakley has identified will be credited to the State's unobligated balance which is then available to be used by the State for its current billings or for other projects that ultimately are approved. The State does not lose any money unless they

continue to do as they have." Transcript of Proceedings at 11. *See also Id.* at 15 and State's Exh. F at 14–15, Attachment D; Secretary's Exh. 10. This Court questions the Secretary's authority to provide obligation authority to Tennessee for funds recovered from the bid-riggers because at least a portion of the recovered funds were originally awarded in 1976. By operation of 23 U.S.C. § 118, therefore, at least some of the obligation authority for these funds has lapsed and the Secretary has no statutory basis to make these funds available to Tennessee. Thus, the Secretary and FHWA appear erroneously to claim that the State will not be injured if it provides the information needed so that the Federal pro rata share may be calculated. The Secretary and FHWA cannot act to Tennessee's favor or injury without specific statutory authority from Congress.

for expenditure"—indicates that the states have the power to obligate funds apportioned under the Highway Act. *Id.* Similarly, in *United States v. Azzarelli Construction Co.,* 647 F.2d 757, 760 n. 4 (7th Cir.1981), the Court recognized, without expressing any opinion, the argument that Highway Act funds become state funds and are expended at the time of their apportionment under § 118(a). This Court concludes that when the Secretary makes an apportionment of funds subject to obligation by a State, those funds cease to be Federal funds and become State funds. 23 U.S.C. § 118(a).

Additional statutory support for this Court's conclusion that after apportionment funds administered under the Highway Act are State funds is found in 23 U.S.C. § 118(b). That statute provides, in relevant part:

(b)(1) Sums apportioned to each Federal-aid system (other than the Interstate System) shall continue available for expenditure in that State for the appropriate Federal-aid system or part thereof (other than the Interstate System) for a period of three years after the close of the fiscal year for which such sums are authorized and any amounts so apportioned remaining unexpended at the end of such period shall lapse.

(2) Except as otherwise provided in this subsection, sums apportioned for the Interstate System in any State shall remain available for expenditure in that State for the Interstate System until the end of the fiscal year for which authorized....

\* \* \* \* \* \*

(4) Sums apportioned to a Federal-aid system for any fiscal year shall be deemed to be expended if a sum equal to the total of the sums apportioned to the State for such fiscal year and previous fiscal years is obligated. Any Federal-aid highway funds released by the payment of the final voucher or by the modification of the formal project agreement shall be credited to the same class of funds, primary, secondary, urban, or interstate, previously apportioned to the State and be immediately available for expenditure.

These provisions indicate that once funds are apportioned to a State, they are available for the State's exclusive use and if not used may be carried over for one additional fiscal year if Interstate funds or for three additional years if non-Interstate funds. *State of Maine v. Goldschmidt,* 494 F.Supp. 93, 95 (D.Me.1980). Thus, the Federal government loses control of funds once apportioned to a State, 23 U.S.C. § 118(b), and only that State can determine how those funds are spent.

Other courts that have examined the Highway Act funding procedure have found that the Highway Act funds are State funds in the nature of a gift to the State. In *D.R. Smalley & Sons v. United States,* 372 F.2d 505 (Ct.Cl.1967), *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967), the plaintiff sought to recover damages from the United States and the State of Ohio on the basis of a contract between Ohio and the plaintiff for construction of a highway under the Highway Act. The Court of Claims dismissed the case as to the United States because of the lack of privity of contract. The Court rejected the plaintiff's theory that liability could be imposed on the United States because it required the highway construction to meet certain standards for reimbursement by the United States under the Highway Act. The Court reasoned that

The National Government makes many hundreds of grants each year to the various states, to municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public works, including roads and highways. It requires the projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise the will of Congress would be thwarted and taxpayers' money would be wasted. *See Mahler v. United States,* 306

F.2d 713, 716–722 (3rd Cir.1962), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231. These grants are in reality gifts or gratuities.

*Id.* at 507. *Accord Somerville Technical Services v. United States,* 640 F.2d 1276, 1280–81 (Ct.Cl.1981); *Correlated Development Corp. v. United States,* 556 F.2d 515, 522–23 (Ct.Cl.1977). Similarly, in *State of Illinois v. Champaign Asphalt Co., slip op.,* No. S–Civ.–73–216 (S.D.Ill. December 1, 1971), the Court held that the United States was not an indispensible party under Fed.R. Civ.P. 19(a) in a case where the State of Illinois sought to recover damages for bid-rigging on highway construction projects under the Highway Act. The *Champaign* Court relied on the *Smalley* Court's holding that the federal funding under the Highway Act is a gift and that the State of Illinois was the real party in interest; the Court further explained that the "fact of federal funding neither minimizes injury suffered by the State nor relegates the State to a role of recovering damages on behalf of the Federal Government in the same proportion as the federal contribution." *Id.* at 8. Implicit in the conclusion of the Courts in *Smalley* and *Champaigne* was the recognition that the United States no longer has a legal interest in Highway Act funds once apportioned to a State.

■ The State's determination of how funds are spent obviously must comply with Highway Act requirements. If a State satisfies all applicable statutory requirements, then the United States through the FHWA administrator will approve a particular highway project which obligates the Federal government to reimburse the State. 23 U.S.C. § 106(a). At this point, the Federal Government is contractually committed to provide financing for a highway construction project. 23 U.S.C. § 120. *See State of Vermont v. Goldschmidt,* 638 F.2d 482, 483

(2d Cir.1980). This contractual commitment on behalf of the Federal Government was recognized in *United States v. Azzarelli Construction Co.,* 647 F.2d 757, 760 n. 4 (7th Cir.1981), as the "vested right" theory. Under this theory, funds are expended and considered State funds when the Secretary approves a construction project.

■ For purposes of this case, it is clear that regardless of whether the Highway Act funds became State funds when apportioned by the Secretary under 23 U.S.C. § 118(a) or when the Federal Government became contractually committed pursuant to 23 U.S.C. § 106(a), the funds reimbursed to Tennessee when it paid the bid-riggers were state funds. The Federal Government lost all legal interest in the funds to the State.[3] Consequently, only the State of Tennessee has a legal interest in the funds at issue in this case.

■ Having determined that only the State of Tennessee has an interest in the Highway Act funds at issue, it naturally follows that only the State was injured by the illegal bid-rigging on highway projects let by the State. In *United States v. Azzarelli Construction Co.,* 647 F.2d 757 (7th Cir.1980), the United States sought recovery under the False Claims Act, 31 U.S.C. §§ 231 *et seq.* (1976), and the Clayton Act, 15 U.S.C. § 15(a) 1976, for overcharges due to bid-rigging on highway construction projects in the State of Illinois. The *Azzarelli* Court affirmed the district court's dismissal of the case reasoning that the Federal Government did not suffer an injury. *Id.* at 758 n. 1 and 761. The Court explained that because the Federal Government contributed a fixed sum to the State for highway construction, it was insulated from any overcharges. *Id.* at 761. The Court recognized, as the Secretary contends in this case, that because of the overcharges the

---

**3.** Counsel for the Secretary at the hearing implicitly recognized that the monies involved in this case belong to the State. In response to the Court's questions, Mr. Billet indicated that by statutory formula Tennessee receives a fixed

obligation limit that is available to Tennessee for projects. As Mr. Billet stated, "It's Tennessee's money to start with, they weigh the contract". Transcript of Proceedings at 20.

Federal Government contributed more to the construction projects than the actual cost. Nevertheless, the *Azzarelli* Court held that this "did not affect the Government's overall contribution to Illinois," *Id.* at 761, primarily because under the Highway Act a state is apportioned a fixed and determinate amount which cannot be exceeded. The Federal Government's contribution to a construction project does not change because "the Government is contractually obligated to pay the State the appropriate Federal contribution once the project is approved. 23 U.S.C. § 106 (1976)." *Id.* at 762 n. 5.

This Court agrees with *Azzarelli's* analysis that the Federal Government suffers no injury when the bid-riggers inflated the costs of a construction project. To be sure, Highway Act funds apportioned to the State were used at an increased rate. It was the State that was injured, however, because it lost the opportunity to use those funds on other highway projects. *Azzarelli* is neither an aberration, as suggested by the Secretary, nor is it based on a misconception of the Highway Act, as suggested by at least one bureaucrat. Secretary's Exh. 6. Except for the present case, the United States has consistently taken the position, in similar cases, that it was not injured because of collusive bid-rigging increasing the federal contribution to a State project. *See, e.g., State of Missouri v. Stupp Brothers Bridge & Iron Co.,* 248 F.Supp. 169, 175–76 (W.D.Mo.1965) and Brief of the United States in *State of Illinois v. Brighton Building & Maintenance Co.,* No. 77–C–4541 (N.D.Ill.), State's Exh. H. Neither is *Azzarelli* based on a misunderstanding of the Highway Act, given that the Secretary's own publication states that the Secretary shall apportion Highway Act funds to the states based on a statutory formula. 23 U.S.C. § 104. U.S. DEPARTMENT OF TRANSPORTATION, FINANCING FEDERAL–AID HIGHWAYS at 16. Thus, this Court finds *Azzarelli* convincing and, therefore, controlling in this case. *See, e.g., Maple v. Citizens National Bank & Trust Corp.,* 437 F.Supp. 66, 68–69 & n. 5 (W.D.Okl.1977).

## IV.

Attempts by the Secretary to withhold, impound or limit funding to the States under the Highway Act are familiar to federal courts. *See, e.g., State of Iowa v. Brinegar,* 512 F.2d 722 (8th Cir.1975); *State Highway Commissioner of Missouri v. Volpe,* 479 F.2d 1099 (8th Cir.1973); *State of Maine v. Goldschmidt,* 494 F.Supp. 93 (D.Maine 1980). The constitutional and statutory limits of the Secretary's authority were defined and explained in *Volpe.* In that case the Court considered the issue of whether President Johnson had authority under the Highway Act to direct the Secretary to withhold $3 billion in highway project obligations for inflation and budgetary purposes in fiscal year 1967. The *Volpe* Court held that absent some specific statutory provision in the Highway Act, the Secretary does not have any express or implied authority to withhold authority to obligate apportioned Highway Act funds. *Volpe,* 479 F.2d at 1118. *See also Pennhurst State School v. Halderman,* 451 U.S. 1, 17–18, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981).[4]

The *Volpe* Court analysis considered the constitutional and statutory issues presented. The Court found that the Constitution under Article I, § 8 granted only Congress authority to build roads or otherwise dictate the standards for highway construction. Until Congress acted, the Executive branch had no authority to affect the national highway system. Thus, the Secretary's au-

---

**4.** *But see Commonwealth of Pennsylvania Department of Transportation v. United States,* 643 F.2d 758 (Ct.Cl.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 117, 70 L.Ed.2d 101 (1981), where the Court notes that neither the State of Pennsylvania nor the United States cited any authority requiring the United States to reimburse unforeseen costs on construction projects. The United States, however, conceded that it had a policy of reimbursing unbudgeted settlement costs. *Id.* at 762.

thority was clearly limited to the terms of the statute Congress enacted. Turning to the Highway Act, *Volpe* noted that Congress enacted a "coherent scheme of statutory duties" to the Secretary. 479 F.2d at 1112. The Highway Act permits the Secretary to exercise discretion to approve or disapprove a construction project, but she must "act within the *specific* direction relating to efficiency, safety and overall compliance with the Act itself." *Id.* (emphasis in original). The *Volpe* Court further found that "Congress did contemplate that the Secretary exercise administrative expertise to see that the apportioned funds are not expended on projects which fail to meet *reasonable* standards of cost". *Id.* (emphasis in original). Nevertheless, Congress specifically authorized the Secretary to withhold obligation authority only if the Secretary of the Treasury determines there would be insufficient funds. The Court then held that there is nothing within the Act which "explicitly or impliedly allows the Secretary to withhold approval of construction projects for reasons remote and unrelated to the Act." *Id.* at 1114. Thus, the *Volpe* Court's holding is based upon the constitutional authority vested in Congress and as expressed by Congress through the Highway Act.

Both parties have at least implicitly recognized the mandate in *Volpe*—that specific Congressional authority is required for the Secretary to recover the Federal pro rata share of the State's bid-rigging recoveries. The Secretary argues that her authority is rooted in 23 U.S.C. §§ 110, 112, 114, 120 and 121. SECRETARY'S BRIEF IN OPPOSITION TO PLAINTIFF'S REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF at 21. Subsequent to the hearing, the Secretary has raised additional arguments to justify her action. First, the Secretary contends that Tennessee has "an affirmative duty under the [project agreements] to recover bid-rigging as well as any other project overcharges". SECRETARY'S SUPPLEMENTAL BRIEF IN RESPONSE TO PLAINTIFF'S REPLY

BRIEF at 3. Second, the Secretary argues that FHWA has discretion to recover the Federal pro rata share of bid-rigging recoveries because the State refused to provide FHWA with information to calculate the federal share. Because the State has an affirmative duty to recover the bid-rigging overcharges, the Secretary maintains that the FHWA administrator has discretion to withhold federal funds when the State refused to provide the defendants Barnhart and Oakley the information requested. The Secretary characterizes her actions as specific performance—requiring the State to comply with federal law and regulations. *Id.* at 4–6. The Secretary relies on a variety of regulations including 23 C.F.R. §§ 1.3, 1.4, 1.9, 1.28, 1.31 and 1.36. *Id.* at 2.

As expected, the State disagrees and maintains that there is no statutory provision imposing an affirmative duty to collect overcharges because of bid-rigging. STATE'S SUPPLEMENTAL REPLY BRIEF at 5. The State further contends that FHWA regulations do not impose and cannot impose an affirmative duty on the State to recover bid-rigging overcharges. *Id.* at 6. The State insists that *Volpe* requires that the Secretary be enjoined from taking any action to withhold the State's Highway Act funds because there is no specific statutory provision authorizing the Secretary's actions.

■ Upon review of the statutory and regulatory provisions cited by the Secretary and after applying the *Volpe* standard, this Court agrees with the State that the Secretary has not been authorized by Congress to withhold Highway Act funds due to the State's bid-rigging recoveries. Neither does this Court find that either the Highway Act or its regulations create an affirmative duty on the State to recover bid-rigging overcharges. Thus, this Court concludes that the Secretary lacks authority to withhold Highway Act funds from Tennessee in the present case.

■ In reviewing the statutory provisions relied on by the Secretary the Court is

guided by the traditional rule of statutory interpretation that a statute must be construed as a whole and that a particular section should not be read in isolation of the remainder of the statute. *Volpe,* 479 F.2d at 1111–12. *See also Pennhurst State School,* 451 U.S. at 18–19, 101 S.Ct. at 1540–1541. While the Secretary may suggest that a particular section of the Highway Act provides the needed Congressional authority, this Court must construe that section within the whole statutory scheme. Moreover, this Court's review of the Highway Act is for the purpose of ascertaining a specific statutory provision justifying the Secretary's actions in the present case.

The Secretary's reliance on 23 U.S.C. § 110 is misplaced. This section requires the execution of a project agreement between the State highway department and the Secretary after the necessary plans for a construction project are approved. While the section requires that the State's pro rata share of a construction project be included in the project agreement, there is no mention of the federal government's share. Execution of a project agreement commits FHWA to a particular construction project, but noting in § 110 addresses the issue of whether the Secretary is authorized to recover from the State overcharges due to bid-rigging.

Next, the Secretary argues that under 23 U.S.C. §§ 112 and 114, the letting and administration of federal-aid contracts is the State's sole responsibility. Additionally, the Secretary contends that FHWA is authorized to reimburse the State only for the actual costs of a construction project under 23 U.S.C. §§ 120 and 121. The Secretary further argues that when there is collusive bidding that inflates the costs of a construction project, clearly the federal reimbursement is higher than actual cost. Consequently, FHWA being required to reimburse only actual cost must recover from the State the overcharge. The Secretary in this regard also maintains that if the State shirked its responsibility to recover the overcharge due to bid-rigging, then the State would be liable. SECRETARY'S BRIEF IN OPPOSITION TO PLAINTIFF'S REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF at 21–22.

Initially, the Court notes that the focus of § 112 is to require the State to let highway construction projects after competitive bidding. Toward the goal of competitive bidding, § 112(c) requires an anti-collusion affidavit from the contractor that in fact is the low bidder that receives a construction project. This anti-collusion affidavit certifies that the contractor has not "either directly or indirectly, entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with such contract." 23 U.S.C. § 112(c). The anti-collusion affidavit is incorporated by reference into every project agreement. Section 114, the Secretary correctly argues, authorizes the State highway department to supervise actual construction of a highway project.

The State has the duty to guarantee compliance of the competitive bidding requirements imposed under § 112. In rejecting the United States' argument that it was injured because of a contractor's bid-rigging, the Court in *Azzarelli* stated that not only was the Government contractually obligated to reimburse the State for the federal share of a project's cost, but § 112 imposed no duties on the contractors but on the State. *Azzarelli,* 647 F.2d at 762 n. 5. If the State fails to comply with the competitive bidding requirements in § 112, then the Government may withhold approval and payment of a construction project. The Government, however, could not withhold its contribution based on a violation of § 112 by the contractor due to bid-rigging. *Id.* In this case, the Secretary does not claim that Tennessee violated § 112. Thus, neither §§ 112 or 114 provide any Congressional authorization for the Secretary to withhold Highway Act funds from Tennessee due to its recoveries of overcharges from bid-riggers.

As to the Secretary's argument that FHWA is required only to pay the actual cost of construction, the Court discerns no statutory basis in 23 U.S.C. §§ 120 and 121 to withhold from Tennessee Highway Act funds because of the State's recoveries from the bid-riggers. Accepting the Secretary's interpretation of §§ 120 and 121 that the federal pro rata share and payment of the federal share of a particular construction project is fixed by statutory formula, neither of these sections in any way suggest that the Secretary can withhold future funds if it is determined that past federal payments exceeded statutory limits. Simply stated, recoupment by the Secretary from a State because the federal share exceeded §§ 120 and 121, it appears, was not envisioned by Congress. Thus, because Congress has the entire constitutional authority over interstate roads, it is clear Congress has not authorized the Secretary to withhold funds under the facts of this case.

▉ Moreover, it is abundantly clear that the Secretary has not cited to this Court a single statutory provision that even remotely suggests that the State has an affirmative duty to seek recovery of overcharges from the bid-riggers.[5] The Secretary's suggestion that Tennessee would be liable if it failed to recover overcharges from the bid-riggers is erroneous. For purposes of the Highway Act, it is well established that Tennessee is not an agent of FHWA or the Federal Government. *Eden Memorial Park Association v. United States,* 300 F.2d 432, 439 (9th Cir.1962); *United States v. Mattingly Bridge Co.,* 344 F.Supp. 459, 462 (W.D.Ky.1972).

Given the Court's conclusion that there is no affirmative duty on Tennessee to recover overcharges from the bid-riggers, the Secretary's reliance on certain administrative regulations must fail. The Secretary argues that the FHWA administrator has discretion under 23 C.F.R. § 1.36 to invoke various administrative remedies. True it is that 23 C.F.R. § 1.36 provides authority to the FHWA Administrator to withhold payments and to take other appropriate action, this regulation applies only if a State fails to comply with or violates federal law or regulations. Because there is no statutory duty that Tennessee recover overcharges from the bid-riggers, there was no violation of federal law when Tennessee refused to provide FHWA the information requested to permit it to calculate the federal pro rata share of recoveries. In short, the FHWA Administrator has no discretion in this case, as permitted in § 1.36, because the Secretary has not shown any violation of federal law or regulations by Tennessee.

Neither does this Court find the regulations cited by the Secretary, specifically, 23 C.F.R. §§ 1.3, 1.4, 1.9, 1.28 and 1.31, applicable in this case. While 23 C.F.R. § 1.28(b) does require the State to furnish information requested by the FHWA Administrator, this regulation applies only when the Secretary finds a State has diverted Highway Act funds in violation of 23 U.S.C. § 126. That section makes it unlawful for a State to use funds for non-Highway Act purposes. In this case, there has never been any suggestion by the FHWA Administrators Barnhart and Oakley that Tennessee has violated § 126. Thus, this section does not apply.

The undisputed affidavit of Michael Shinn, State's Exh. K, establishes that the Tennessee Department of Transportation has received $6,192,073.81 from the State's antitrust settlements with the bid-riggers. Of this amount, Mr. Shinn explains that $4,700,000.00 has been allocated to the State's general fund by legislative act of

---

5. To the extent that the defendants argue that they have authority to demand a share of Tennessee's recoveries based on the opinions of the United States Comptroller General, Secretary's Exh. 4 and 5, this Court does not find those opinions persuasive because the Comptroller General does not cite any statutory provisions enacted by Congress authorizing the defendants' actions in this case. Consequently, those opinions are not relevant to the constitutional and statutory issues presented.

the Tennessee General Assembly. The Tennessee Department of Transportation has retained $1,492,074.81. Of this amount, the Transportation Department has apportioned $953,573.81 to the Department's fund balance for appropriation in future years and $538,500.00 has been apportioned to current revenues for financing current expenditures. It is clear from the Shinn affidavit as well as the State's Deputy Attorney General's statement at the hearing that Tennessee has used its recoveries from the bid-riggers for non-Highway Act purposes. Transcript of Proceedings at 26. To that extent, the State has clearly diverted Highway Act funds for purposes other than those outlined in the Highway Act. This Court disapproves of the Tennessee General Assembly's and Tennessee Department of Transportation's use of recovered Highway Act funds for purposes inconsistent with the Highway Act. In this case, however, the defendants do not base their decision to recover Highway Funds from Tennessee on 23 U.S.C. § 126; consequently, this section is not applicable.

Furthermore, for the reasons stated in Part V of this Memorandum, the Court finds that even if § 126 was applicable to this case, the undisputed facts of this case show that the defendants are equitably estopped from justifying their actions based on § 126. This, of course, only applies to those antitrust recoveries already recovered by the State, not those which the State may receive in the future. Thus, the defendants as trustee of the Highway Trust Fund under the Highway Act may recoup under § 126 Highway Act funds used for non-Highway Act purposes in the future.

## V.

As an alternative holding, this Court is of the opinion that even if there was statutory authority for the Secretary and FHWA to recoup money from Tennessee and even if there was an affirmative duty on Tennessee to recover the overcharges from the bid-riggers for itself and the Federal Government, the undisputed facts in this case mandate the application of equitable estoppel against the Federal Government. The State argues that estoppel is especially appropriate in this case not only because the traditional estoppel elements are present but also because of the defendants' affirmative misconduct and because the balance of interests favor Tennessee. The Secretary counters by asserting that not only has the State failed to establish the traditional estoppel elements but there was no affirmative misconduct by the defendants. This Court concludes that the elements of estoppel are present in this case and the Federal Government has clearly engaged in affirmative misconduct toward Tennessee that would make it fundamentally unfair for the defendants to recoup Tennessee's recoveries from the bid-riggers.

Although traditionally the doctrine of equitable estoppel as applied to the Government has not been favored, the doctrine has undergone "considerable development" and many courts have acknowledged and applied the doctrine against the Government. *Rogers v. Tennessee Valley Authority*, 692 F.2d 35, 37 (6th Cir.1982). The Supreme Court has acknowledged the doctrine as applicable against the Government, but it has not defined the contours for application. *See, e.g., Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981); *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973); *Rogers*, 692 F.2d at 38. Generally, those courts that have applied the doctrine against the Government require that the traditional four estoppel elements be present in the case plus affirmative misconduct by the Government. *Rogers*, 692 F.2d at 37. The elements of estoppel are: (1) that the party to be estopped knows the facts; (2) that the party intends that his conduct be acted on or the party acts in a manner that the party asserting the estoppel has a right to believe that it is intended that the conduct be relied on; (3) that the party asserting estoppel be ignorant of the

true facts; and (4) that the party asserting estoppel rely on the conduct to his injury. *United States v. Ruby Co.,* 588 F.2d 697, 703 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 248 (1979); *United States v. Wharton,* 514 F.2d 406, 412 (9th Cir.1975); *United States v. Georgia-Pacific Co.,* 421 F.2d 92, 96 (9th Cir.1970). In addition to these four necessary elements of estoppel, when applied to the Government, there must also be an affirmative misrepresentation, misconduct or concealment by the Government. *INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973); *United States v. Harvey,* 661 F.2d 767, 774 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 74, 74 L.Ed.2d 72 (1982); *Yang v. Immigration and Naturalization Service,* 574 F.2d 171, 175 (3rd Cir.1978); *United States v. Ruby Co.,* 588 F.2d at 703–04. *Cf. Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981).

Applying these principles to the instant case, the Court finds that all of the traditional estoppel elements are satisfied. First, the undisputed affidavit of Mr. Litvack clearly establishes that General Leech inquired on behalf of the State of Tennessee, concerning the interest of the United States in the State's recoveries of overcharges from the bid-riggers. Mr. Litvack represented to General Leech that the United States did not have any legal claim or interest in the State's recoveries. State's Exh. G. Mr. Litvack's representations are supported fully in the United States' briefs in the *Azzarelli* and *Brighton* cases. State's Exh. H and I.

■ Because Mr. Litvack was the Assistant Attorney General in the Antitrust Division, United States Department of Justice, when he informed General Leech of the United States' position in September 1980, he had authority to represent the United States. It is well-established that the Attorney General is the chief legal officer of the United States. In this capacity, and absent contrary congressional directive, he is vested with plenary power over all litigation to which the United States or an agency of the United States is a party. 28 U.S.C. §§ 516, 519; *ICC v. Southern Ry. Co.,* 543 F.2d 534, 535–36 (5th Cir.1976). *See also Marshall v. Gibson's Products, Inc. of Plano,* 584 F.2d 668, 676 n. 1 (5th Cir. 1978). Moreover, it is clear that the Attorney General has unquestioned authority and a continuing duty to protect the public's interests. *See, e.g., Vitamin Technologists v. Wisconsin Alumni Research Foundation,* 146 F.2d 941, (9th Cir.), *cert. denied,* 325 U.S. 876, 65 S.Ct. 1554, 89 L.Ed. 1994 (1945). Congress has specifically empowered the Attorney General or his appointee to "attend to the interests of the United States" in a pending case in federal or state court or "to attend to any other interest of the United States". 28 U.S.C. § 517. Thus, Mr. Litvack, as an Assistant Attorney General, not only had the authority to represent the United States' position as to the State's recovery of overcharges, but he had the statutory duty to explain the public's interest in the matter. Mr. Litvack also had the authority to represent the position of the United States Department of Transportation. 28 U.S.C. §§ 516 and 517.[6]

The other estoppel elements are also present in this case. Second, Mr. Litvack

---

6. Congress has authorized the Attorney General to conduct litigation and protect the national interests when the United States or an agency is involved. A broad grant of authority is provided in 28 U.S.C. § 516 which states that "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to the officers of the Department of Justice, under the direction of the Attorney General." This section authorizes the Attorney General to act not only when the United States, an agency or officer of the United States is a party but also if they are merely "interested" in litigation in which they are not parties. Additionally, a further grant of authority is given to the Attorney General in 28 U.S.C. § 517, which authorizes the Attorney General to protect the interests of the United States in federal and state court as well as "to attend to any other interest of the United States". When these two sections are combined—28 U.S.C. §§ 516 and 517—it clearly appears that Mr. Litvack had clear Congressional authority to present and to state to General Leech what, if any, interest the United States had in the State's investigation

intended in September 1980, that the State act on his opinion given to General Leech. Clearly, Mr. Litvack was aware of the State's investigation and prosecution of the bid-riggers. His undisputed affidavit states that "the United States had no interest in Tennessee's efforts to recover any overcharges and Tennessee's settlement fund . . . ." Tennessee had a clear representation from the United States that it could recover whatever overcharges it could from the bid-riggers without any concern that the United States would claim an interest. Clearly, Litvack intended his advice to be relied upon and it was. Third, there is absolutely no evidence suggesting that any Tennessee official had any knowledge that the United States would change its policy toward Tennessee's settlement fund or that the United States might have dual and conflicting policies. Certainly, given the representation from the Attorney General through his assistant, no Tennessee official had any reason to believe that the United States would want an interest in the State's recovered funds. Fourth, the State relied on Mr. Litvack's representation when it recovered the overcharges from the bid-riggers and allocated them for Tennessee's use. Much disruption and injury would result if Tennessee were now forced to give the United States a share of its settlement funds. Evans Affidavit, State's Exh. J. Shinn Affidavit, State's Exh. K. Certainly, it was reasonable for Tennessee to rely on Mr. Litvack's statements made when he was the Assistant Attorney General in charge of the Antitrust Division in the U.S. Department of Justice. *United States v. Lazy FC Ranch,* 481 F.2d 985, 990 n. 6 (9th Cir.1973).

 The inconsistent positions taken by two agencies of the Executive branch

toward Tennessee constitute the requisite affirmative misconduct and fundamental unfairness necessitating application of estoppel against the Government. On the one hand, the Attorney General, pursuant to proper statutory authorization, represented that the United States had no claim or interest in the State's settlement funds from the bid-riggers; while on the other hand, the Secretary and FHWA, without any statutory authorization or Congressional directive, attempted to recoup the Federal share of the same settlement funds. This is clearly and unmistakeably affirmative governmental misconduct. The estoppel doctrine is fairly applied against the United States when "justice and fair play require it", *United States v. Lazy FC Ranch,* 481 F.2d 985, 988 (9th Cir.1973), and when the balance of interests supports its application. *United States v. Ruby Co.,* 588 F.2d 697, 703 (9th Cir.1978). The interests of Tennessee clearly outweigh those of the Secretary and FHWA. Tennessee sought out the proper federal official and acted consistently with that federal official's advice. Tennessee has allocated the funds for use and is threatened with injury if the funds are lost. Tennessee's interest in protecting its funds properly acquired is decidedly more weighty than the Secretary's and FHWA's unauthorized recoupment to satisfy some bureaucratic bookkeeping procedure. It would be fundamentally and totally unfair for the Secretary and FHWA to share in Tennessee's settlement funds under these circumstances and, thus, the defendants must be estopped from so doing.

For all of the foregoing reasons, judgment will enter for the State of Tennessee and the defendants will be enjoined in an appropriate ORDER.

---

and prosecution of the bid-riggers. It is critical to recognize that when Mr. Litvack spoke he represented the interests of the United States, including the Federal Department of Transportation and FHWA. Absent contrary proof or

Congressional directive, Mr. Litvack's statements must be deemed by this Court as true, correct and binding.

FIGURE I

## FINANCIAL PROCEDURES
### (CONTRACT AUTHORITY PROGRAMS)

SOURCE: U.S. DEPARTMENT OF TRANSPORTATION, FINANCING - FEDERAL - AID HIGHWAYS (1979).

CEILING ON HIGHWAY PROGRAM -- SPECIFIES THE MAXIMUM AMOUNT WHICH CAN BE OBLIGATED DURING THE PRESENT FISCAL YEAR

TOTAL AVAILABLE OBLIGATION AUTHORITY

LIMITATION*

HAS LIMITATION BEEN REACHED ?

YES

NO

NO ADDITIONAL OBLIGATIONS THIS FISCAL YEAR

OBLIGATION

COMMITMENT BY FEDERAL GOVERNMENT TO REIMBURSE STATE FOR FEDERAL SHARE OF TOTAL PROJECT COST

FROM HIGHWAY USER TAXES

REVENUES

BEGIN PROJECT

DEPOSITORY FOR REVENUES

HIGHWAY TRUST FUND

VOUCHER SUBMITTAL

STATE REQUESTS REIMBURSEMENT FROM FEDERAL GOVERNMENT PROGRESS PAYMENTS MAY BE MADE PRIOR TO PROJECT COMPLETION

PROVIDES CASH NECESSARY TO REIMBURSE ESTIMATED VOUCHER SUBMITTALS DURING FISCAL YEAR

APPROPRIATION ACT

PAYMENT

STATE IS REIMBURSED FOR FEDERAL SHARE OF WORK COMPLETED

*LIMITATION MAY BE INITIATED BY THE EXECUTIVE BRANCH OR THE CONGRESS

## ORDER

Pursuant to the Memorandum of Law contemporaneously filed in the above-styled case finding that nowhere in the Federal-Aid Highway Act, 23 U.S.C. §§ 101, *et seq.,* is there any specific Congressional authorization allowing the Secretary of the United States Department of Transportation or the Administrator or Division Administrator of the Federal Highway Administration of the United States Department of Transportation to demand a share of the State of Tennessee's recoveries of money from those persons, firms and associations that rigged bids on State highway construction projects under the Act in the estimated amount of $4,500,290.00; and

Further finding that even if the Secretary of Transportation or the Administrator and Division Administrator of the Federal Highway Administration had Congressional authority, under the facts of this case they should be estopped from asserting that authority to prevent fundamental unfairness and injury to the State of Tennessee;

It is therefore ORDERED AND DECREED that the Federal-Aid Highway Act, 23 U.S.C. §§ 101, *et seq.,* imposes no duty on the State of Tennessee to pay the Federal Government any of its recoveries from bid-riggers on State highway construction projects and that the Federal Government's demand to the State of Tennessee for a share of those recoveries is without Congressional authorization in the Federal-Aid Highway Act, 23 U.S.C. §§ 101, *et seq.,* and is without support under Article I, Section 8 of the Constitution of the United States;

It is further ORDERED that the Secretary of the United States Department of Transportation and the Administrator and Division Administrator of the Federal Highway Administration, their employees, agents and all persons acting in concert with them are hereby permanently enjoined from withholding or debiting or failing to honor the State of Tennessee's current billings for eligible costs incurred by the State on approved highway projects under the Federal-Aid Highway Act, 23 U.S.C. §§ 101, *et seq.,* and that the Secretary and FHWA Administrators are hereby permanently enjoined from in any manner decreasing the amount of monies, obligation authority or apportionment for the State of Tennessee under the Act if such withholding, debiting or decreasing is due to the recoveries by the State of any overcharges which are as of this date reflected in a settlement agreement between the State of Tennessee and bid-riggers on highway construction projects in violation of Federal and State antitrust laws.